JOURNAL ENTRY AND OPINION
{¶ 1} A jury found defendant Anthony Gaines guilty of murder, aggravated robbery, grand theft motor vehicle and tampering with evidence. The court made a separate guilty finding on a charge of having a weapon while under disability. Broadly stated, the issues raised in this appeal contest the sufficiency and weight of the evidence supporting the conviction, and the admission of certain pieces of evidence.
 {¶ 2} Family members found the victim's body in the basement of her house on January 3, 2002. She had been shot eight times, and bullets and casings found in the kitchen suggested that she had been shot in that room and dragged down to the basement. The police found evidence that the kitchen floor had been cleaned after the body had been moved to the basement. There were no signs of breaking and entering. The coroner could not give a precise time of death, but estimated that it occurred between 2:00 a.m. and 2:00 p.m. on January 2, 2002. One of the victim's next-door neighbors testified with conviction that she heard "four or five gunshots" between 7:00 and 8:00 p.m. on January 1st and then perhaps fifteen to twenty minutes later saw a silver car pulling out of the victim's driveway. She did not see the driver.
 {¶ 3} The state built its case against Gaines on circumstantial evidence. The evidence showed that Gaines and the victim were romantically involved, but for the last four months of her life the victim also maintained an intimate relationship with a man named Charles Fagan. Fagan had befriended the victim when the victim's car sustained serious damage in an accident. At first, Fagan drove the victim to work, but he soon lent her three different cars. At the time of her death, the victim drove Fagan's silver Mercury. Gaines knew about the loaned car, and previously used it without either Fagan's or the victim's permission. Because of this, the victim restricted Gaines' use of the car and erected a locked fence in her driveway to keep Gaines from using the car.
 {¶ 4} When the family members discovered the victim's body, they could not find Fagan's silver car. The police later discovered it being driven by two drug dealers. The drug dealers told the police that Gaines had traded them the car for drugs. Witnesses testified that Gaines had been at the victim's house on New Year's Day, and that he had driven the victim's car that day to run errands for her.
 {¶ 5} To establish a motive for the murder, the state offered into evidence a number of letters Gaines wrote to the victim. The letters asserted his love for her and jealousy with Fagan. To bolster the contents of these letters, the state presented testimony from a handyman who performed odd jobs for the victim and her neighbor. The handyman testified that he had a conversation with Gaines three months before the murder in which Gaines informed him that he found a leather coat in the victim's house. The handyman quoted Gaines as saying "he was tired of [the victim's] BS, that he would kill her, her mother, brother, daughter, he didn't give an F." In a reference to his commitment to stay in a relationship with the victim, one of the letters contained this passage: "I will fight or die for mine, or do what ever [sic.] it takes to keep mine, what ever [sic.] it take [sic.]."
 I {¶ 6} The first assignment of error challenges the admission of two bits of evidence: the letters that Gaines allegedly wrote to the victim and testimony that the victim made it her habit not to allow Gaines to use her car without having another person present.
 A {¶ 7} Gaines first argues that the court erred by allowing the letters into evidence because they were not properly authenticated. He claims there was no evidence produced that he wrote the letters as claimed by the state. Although Gaines did object to the letters because they contained references to his being in prison while writing them (references which the court redacted), he did not object to the admission of the letters on the basis of authenticity. We therefore review this argument for plain error to determine whether the admission of the evidence resulted in a manifest misjustice. See State v. Long (1978),53 Ohio St.2d 91, paragraph three of the syllabus.
 {¶ 8} The general rule relating to the authenticity of a document is stated in Evid.R. 901(A), which provides that "authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Put another way, the rule of authentication is simply to provide that a document is what it purports to be.
 {¶ 9} Authentication of a document for purposes of admission into evidence is not the same thing as a factual determination that the document is true and accurate. The latter is a factual determination to be made by the trier of fact. In State v. Brown, 151 Ohio App.3d 36,48-49, 2002-Ohio-5207, the Seventh District stated:
 {¶ 10} "The hurdle the proponent of the document must overcome in order to properly authenticate a document is not great. For instance, `with respect to a document attributed to the defendant, the prosecution need only provide a rational basis from which the jury could infer that the document did, in fact, belong to him.'
 {¶ 11} "The showing of authenticity is not on a par with more technical evidentiary rules, such as hearsay exceptions, governing admissibility. Rather, there need be only a prima facie showing, to the court, of authenticity, not a full argument on admissibility. Once a prima facie case is made, the evidence goes to the jury and it is a jury who will ultimately determine the authenticity of the evidence, not the court. The only requirement is that there has been substantial evidence from which they could infer that the document was authentic." (Citations omitted.)
 {¶ 12} Defense counsel no doubt failed to object to the authenticity of the letters because they were very clearly written by Gaines. The letters are signed either "Anthony" or "Ant." The court redacted parts of the letters that referred to Gaines writing the letters while incarcerated. Besides references to being incarcerated, the letters reference a number of other facts that were peculiar to Gaines, including his reference to "Charles" (presumably Charles Fagan) and "Charles" relationship to the victim.
 {¶ 13} Our review of these letters convinces us that even had an objection been made, the court would not have abused its discretion by finding they met the threshold level of authenticity needed to admit them into evidence. They reference too many facts to survive the argument that they could not be inferred to be authentic. And, of course, given that our standard of review is for plain error, we fail to see how the correct admission of the letters resulted in a manifest injustice.
 B {¶ 14} Evid.R. 404(B) prohibits the admission of "other acts" evidence when that evidence is intended to prove the character of a person in order to show that he acted in conformity therewith. The letters introduced by the state show Gaines had a relationship with the victim, that the victim had accused him of romantic duplicity with another, that Gaines denied this duplicity and pledged his devotion to the victim, that Gaines was aware that the victim might have been seeing another man named "Charles," and that Gaines would take all necessary steps to prevent "Charles" from coming between him and the victim. Gaines argues that the court abused its discretion by permitting the introduction of the letters because the letters were written between five and six months prior to the murder and thus were too remote in time to prove that he acted in conformity with the thoughts expressed in those letters.
 {¶ 15} The use of other acts evidence has traditionally been barred because it is generally not relevant to show guilt. Past actions by a person, without more, do not speak to the guilt of that person for subsequently committed acts. In other words, the state cannot establish guilt simply by showing that the accused may have acted badly in the past and that the past conduct shows a propensity to commit crime.
 {¶ 16} Although other acts evidence cannot be used to prove Gaines' character and that he acted in conformity with the thoughts and ideas expressed in those letters, it can be used for other purposes such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." See Evid.R. 404(B). When other acts evidence is offered for a proper purpose, it is still subject to the limitations placed on all other evidence under Evid.R. 402 and 403. Because there is always the risk that other acts evidence might be unduly prejudicial, the United States Supreme Court has established factors to be considered by the courts: (1) the other crimes evidence must have a proper purpose, (2) the proffered evidence must be relevant, (3) its probative value must outweigh its potential for unfair prejudice, and (4) the court must charge the jury to consider the other crimes evidence only for the limited purpose for which it is admitted.Huddleston v. United States (1988), 485 U.S. 681, 691.
 {¶ 17} The letters do not constitute "other acts" as contemplated by Evid.R. 404(B). Gaines' "act" of writing a letter is nothing for purposes of the rule — it is the contents of the letters that are important. And the content of the letters show no conduct that could be considered within the rule. The letters portray Gaines as a jealous man, perhaps even desperate to hold onto his relationship with the victim. But nothing in those letters contains an overt act that would fall under Evid.R. 404(B). Jealousy is an emotion, not an act. Without some physical manifestation of that emotion, the thoughts expressed in the letter remain just that — thoughts.
 {¶ 18} Instead, we find that the letters were admissible because they gave context to subsequent events. Evidence that concerns "the chronological unfolding of events that led to an indictment, or other circumstances surrounding the crime, is not evidence of `other acts' * * *." United States v. Ojomo (C.A. 7, 2003), 332 F.3d 485, 489, quotingUnited States v. Ramirez (C.A. 7, 1995), 45 F.3d 1096, 1102. The Seventh Circuit explained that, subject to admissibility under Evid.R. 403:
 {¶ 19} "Acts satisfy this `inextricably intertwined' doctrine if they `complete the story of the crime on trial; their absence would create a chronological or conceptual void in the story of the crime; or they are so blended or connected that they incidentally involve, explain the circumstances surrounding, or tend to prove any element of, the charged crime.'" Id., quoting United States v. Senffner (C.A. 7, 2002),280 F.3d 755, 764.
 {¶ 20} The letters completed the story of the crime by showing why Gaines' relationship with the victim led the police to consider him a suspect. The letters paint Gaines as a jealous man, pledging his willingness to stay in a relationship with the victim and prevent any outside influence from interfering with that relationship. The letters also explain why Gaines might be upset with Fagan lending the victim a car, and why Gaines might not have any qualms about using Fagan's car as though it were his own. Without the letters, the jury would be left no context to explain why Gaines would be involved with murdering the victim.
 {¶ 21} The final question is the application of the "inextricably intertwined" doctrine under Evid.R. 403. That rule provides for the mandatory exclusion of evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury See Evid.R. 403(A). Exclusion is discretionary if the probative value is substantially outweighed by considerations of undue delay or needless presentation of cumulative evidence. See Evid.R. 403(B). The court has "broad discretion" to admit or exclude evidence under Evid.R. 403(A), and we will not reverse the ruling absent a "clear abuse" of that discretion. State v. Hanna, 95 Ohio St.3d 285, 290,2002-Ohio-2221.
 {¶ 22} The letters neither confused the issues nor misled the jury, so the only viable argument for mandatory exclusion was that the probative value of the letters was substantially outweighed by undue prejudice. In undertaking this inquiry, we find the letters were remote in time to the murder because they were written five to six months before the murder.
 {¶ 23} Nevertheless, the circumstances are such that we cannot say they are so remote in time as to be unfairly prejudicial to Gaines. Gaines was a jealous man and nothing in evidence showed that his jealousy cooled between the time he wrote the letters and committed the murder. The court could reasonably infer that Fagan's presence continued to be a source of irritation to Gaines, as mentioned by the handyman who said that Gaines was tired of the victim's "BS." This long-simmering animosity is exactly the kind of evidence that is probative. And it bears mentioning that Gaines had been in prison at the time he wrote the letters, so an immediate opportunity to take action against the victim may not have presented itself. In any event, we find the court had no mandatory duty to exclude the letters.
 {¶ 24} The court likewise did not err on the question of discretionary exclusion under Evid.R. 403(B) because Gaines has made no showing of undue delay or needless presentation in the letters.
 C {¶ 25} The state charged Gaines with the theft of the victim's car. Because the victim could not testify as to whether she gave permission to Gaines to use the car, the state asked that it be allowed to elicit testimony from the victim's family that she made it her "habit" to limit Gaines' access to Fagan's car. The court permitted the testimony as "habit" and Gaines now argues that the court erred in doing so, as it amounted to a backdoor manner of permitting otherwise inadmissible hearsay.
 {¶ 26} Evid.R. 406 permits "evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." In a sense, Evid.R. 406 is an exception to Evid.R.404(B) since it admits evidence to show that a person acted in conformity with that person's character on a particular occasion.
 {¶ 27} There are two kinds of "habitual" behavior the rule covers: uniformity in responding to a situation and non-volitional conduct. See, generally, Mengler, The Theory of Discretion in the Federal Rules of Evidence (1989), 74 Iowa L.Rev. 413, 416-418. An example of each can be demonstrated by the person who reads every night before bed: "* * * the routine practice of reading a novel before going to bed, while customary, could not be habitual because it is volitional. In contrast, the regular practice of turning the pages of the novel with one's left hand could be habitual because of its mechanical or automatic nature." Id. at 417. The Staff Note to the Federal Rule (which rule Ohio adopted without change), does not distinguish between the two different theories of habitual conduct. Certainly, non-volitional conduct is truer in form to traditional evidence of habit in that all variables are removed — it can be said with certitude that the actor would act consistently if there was no volition involved in the act. Evidence of probable conduct, that is conduct in which the actor manifested a regular response to a situation (like reading before going to bed) strays into conduct that can be more variable, yet the rules drafters clearly considered that evidence of probable conduct could be admissible under Evid.R. 406. To be sure, however, Evid.R. 406 extends no farther than to admit evidence concerning "a person's regular response to a specific situation." Id.
 {¶ 28} Ohio law follows the more liberal approach and admits evidence of probable conduct as habit as long as the conduct is "semi-automatic." Cardinal v. Family Foot Care Centers, Inc. (1987),40 Ohio App.3d 181, 182. The term "semi-automatic" denotes something less than non-volitional conduct, and places evidence of habit into the realm of probability rather than certitude. Hence, the courts have found that "[e]vidence as to one or two isolated occurrences does not establish a sufficient regular practice for admission pursuant to Evid.R. 406."Bollinger, Inc. v. Mayerson (1996), 116 Ohio St.3d 702, 715 (citations omitted). The goal is to establish by high probability that a particular act occurred. As with all questions concerning the admissibility of evidence, we review the court's decision to admit evidence under Evid.R. 406 for an abuse of discretion. State v. Maurer (1984), 15 Ohio St.3d 239,265.
 {¶ 29} The victim's daughters testified that the victim would only allow Gaines to use the car to run errands for her, and only if the victim's brother accompanied him. They said that Gaines was not allowed to use the car for any personal reasons.
 {¶ 30} None of this testimony even remotely went to evidence of habit under Evid.R. 406. Evidence of habit requires a showing that the person to whom the habit is attributed performs a repeating act, either involuntarily or so consistently that the probabilities are such that in the absence of direct evidence to the contrary, the trier of fact may infer that the character of the person is such that the act actually occurred as it has so often in the past. The only "act" offered into evidence was that the victim forbade Gaines from using her car for personal reasons. This is more in the nature of a standing order by the victim than a repeated act. She did not regularly and repeatedly deny Gaines the use of the car. For example, had the evidence shown that the victim called Gaines every day for months and told him that he could not use her car, those repeated calls might be competent to establish a habit on the one day in succession when there was no direct proof of that fact. But simply asserting to family members that Gaines was forbidden the use of the car for purely personal reasons was not a repeating act that rose to the level of habit. The victim may well have changed her mind, as firmness of conviction without corroboration by way of proof of habit is always open to change. The court erred by permitting evidence of habit.
 II {¶ 31} The next series of arguments relate to Gaines' complaints that the court erred by denying to grant two different motions for retrials.
 A {¶ 32} This was Gaines' second trial. The first trial ended in a mistrial because, among other things, the court decided there were so many references to Gaines' past criminal history that no amount of cautionary instructions could guarantee him a fair trial. The second trial was thus conducted with very strict admonishments to the witnesses that they make no mention of Gaines' criminal history. During the retrial, the victim's daughters testified that the victim kept her car keys in her bra to prevent Gaines from "stealing" the car. Gaines argues that although the court sustained his objection and cautioned the jury to disregard the witnesses' remark, the state elicited the same kind of evidence that forced the mistrial and that no cautionary instruction could not cure the prejudice.
 {¶ 33} A mistrial should be granted only when a fair trial is no longer possible. State v. Franklin (1991), 62 Ohio St.3d 118, 127. The decision to grant a mistrial is within the sound discretion of the trial court. State v. Glover (1988), 35 Ohio St.3d 18, 19.
 {¶ 34} During the direct examination of one of the victim's daughters, the state established that the victim kept her car keys in her bra. When asked whether she knew why the victim kept her car keys in her bra, the witness replied, "[b]ecause Anthony was stealing her car." The court immediately sustained a defense objection and instructed the jury to disregard the comment.
 {¶ 35} We have serious doubts about the state's motives in asking why the victim kept her car keys hidden from Gaines. The state appears to concede for purposes of this appeal that the answer constituted an "error." With this concession, we are left to wonder why it asked the question in the first place, inasmuch as it knew exactly what the answer would be, having suffered a mistrial of the answer given by the witness when the question was asked in the previous trial. We understand that the state told the court that it had admonished its witnesses to avoid mentioning any of Gaines' past misconduct. But many witnesses lack the discipline to remember such admonitions while on the witness stand The state ought not ask questions that it knows are fodder for a mistrial.
 {¶ 36} Nonetheless, we have to agree with the state that the court's cautionary instruction is presumed to be sufficient to cure the state's error in prompting the offending testimony. State v. Treesh
(2001), 90 Ohio St.3d 460, 480. The court properly cautioned the jury to ignore the witness' answer. It also scrupulously avoided any mention of Gaines' past record, and repeatedly cautioned the parties do to the same. We are unable to say that one single mention of Gaines having stolen the victim's car was sufficient to taint the entire trial.
 B {¶ 37} In the midst of trial, the court learned that a juror had been admitted to the hospital because of an asthma attack and would be unable to continue to serve on the jury. The court ordered that the juror be excused and an alternate seated. Gaines argues that the court should have either continued the trial until the juror regained her health, or granted a mistrial.
 {¶ 38} Crim.R. 24(F) allows the court to replace jurors who "* * * become or are found to be unable or disqualified to perform their duties * * *." The rule gives the court broad discretion to replace jurors.State v. Coleman (1988), 37 Ohio St.3d 286, 293; State v. Gleason
(1989), 65 Ohio App.3d 206, 210. The federal courts, citing to the identically-worded provision of Fed.R.Crim.P. 24(c)(1) have held that "the substitution of an alternate juror for a regular juror for reasonable cause is within the prerogatives of the trial court and does not require the consent of any party." See United States v. Warren (C.A. 6, 1992), 973 F.2d 1304, 1308-1309. See, also, United States v.Ellenbogen (C.A. 2, 1966), 365 F.2d 982, 989, certiorari denied (1967),386 U.S. 923.
 {¶ 39} The court's reasons for refusing to continue the trial or grant a mistrial are obvious. This was a second trial and the court was justifiably reluctant to order a third trial unless absolutely necessary. We concede that the court did not conduct a hearing on the matter in order to determine whether a continuance might be in order, but we think a hearing would not have served any useful purpose. The juror had been admitted to the hospital, and it seems doubtful that the juror could have been contacted for questioning. A continuance may well have been so open-ended as to provide no solution to the problem. The court could reasonably consider that the appearances of witnesses had been previously arranged and that a continuance would so disrupt the process as to render futile. Circumstances like these are exactly why Crim.R. 24(F) was adopted.
 {¶ 40} Gaines' primary argument appears to be that substitution of the alternate juror affected the racial makeup of the jury to his detriment. In his objection to the court's decision to replace the ill juror, Gaines' counsel made the following remarks:
 {¶ 41} "That this juror was specifically chosen by us and wanted by us for a number of reasons. One of the things, she had good qualifications. The other reason is she had a family member that was involved in some sort of a homicide, not as a victim. So she had outstanding qualifications. The third reason is, and they're not altogether in this order, she is black. * * *"
 {¶ 42} It is important to understand that Gaines is not making a constitutional argument relating to the racial makeup of the panel. He cites no cases to that effect nor does he make any specific argument to that effect. We are mindful of our obligation to avoid constitutional issues if they may be decided on other grounds. In re Miller (1992),63 Ohio St.3d 99, 110. While Gaines may have preferred to keep the juror on the panel for the reasons stated by him, they alone are not enough to find that the court abused its discretion.
 C {¶ 43} Finally, Gaines argues that the court abused its discretion by failing to grant a mistrial based upon a question asked by the jury during deliberations. The jurors asked, "Can we know the length of time Anthony Gains was incarcerated in the year 2001?" The court gave the jury a response which told the juror that "it is improper for you to presume, surmise, or consider that Defendant Gaines was incarcerated in 2001, or at any other time." Gaines argues that this instruction could not have cured the prejudice stemming from the introduction of the letters.
 {¶ 44} Our earlier comments about the presumption that jurors follow the instructions given to them are equally applicable here. The court gave a very strong cautionary instruction that should easily have prevented the jurors from making assumptions about Gaines' past incarceration, if any. We admit that the question does raise the implication that the court's efforts to keep Gaines' past history from the jury were not as effective as it hoped. Nevertheless, we don't know what facts prompted the question, and thus have to assume the effectiveness of the court's curative instruction.
 III {¶ 45} Although there are generally no double jeopardy considerations when a mistrial is declared, when a mistrial is declared based on prosecutorial misconduct, the Constitution bars a retrial if the prosecutor's misconduct was calculated to goad the defendant into seeking a mistrial. See Oregon v. Kennedy (1982), 456 U.S. 667, 675-676. Gaines argues that the court had to declare a mistrial at his request in the first case because the state failed to ensure that his prior record would be kept from the jury. He therefore believes that his retrial is barred by double jeopardy.
 {¶ 46} The standard we apply in cases where a mistrial has been declared without the defendant's request or consent, is that double jeopardy will not bar a retrial if (1) there was a manifest necessity or a high degree of necessity for ordering a mistrial, or (2) the ends of public justice would otherwise be defeated. See State v. Widner (1981),68 Ohio St.2d 188, 189-190.
 {¶ 47} Double jeopardy rights are personal rights that can be waived when the accused does not raise the issue of double jeopardy prior to a retrial. See State v. Head (Sept. 20, 1985), Lake County App. No. 10-258; State v. Riddle (Dec. 18, 2001), Mahoning App. No. 99 CA 147. Gaines concedes that he did not raise double jeopardy as a bar to the second trial, so we can only review this argument for plain error.
 {¶ 48} The court granted the mistrial because:
 {¶ 49} "The court finds based upon the cumulative nature of everything that's occurred in this trial beginning with the newspaper article after the first day, the witness' testimony as well as comments made through numerous witnesses, which the defense did preserve each and every objection and request a mistrial, the court finds that it does have no choice but to declare a mistrial so that this trial does not proceed and the defendant, quoting him, feels like he's railroaded.
 {¶ 50} "The court finds that all the statements, all the things contained in the newspaper articles, references to the fact that the defendant has a criminal record, these [sic.] he's been to prison before, that he wrote these letters from prison or that he got out of prison, not to mention the mother's statements that the defendant held a gun to her son's head — I can go on and on.
 {¶ 51} "The court feels in the interest of justice that a mistrial is warranted."
 {¶ 52} The court's findings are not enough to convince us first, that the state goaded Gaines into requesting the mistrial, and second, that a manifest misjustice occurred by conducting a second trial. Had the court believed that the mistrial was prompted by the state's actions, it would have said so in certain terms. It appears that the court was concerned with comments made by witnesses. We have to assume that the state did not prompt the witnesses to make inappropriate statements. The second trial demonstrates this point, as the state assured the court that it instructed its witnesses not to mention Gaines' prior record, and for the most part the witnesses appeared to follow that instruction. Because, nothing in the record rises to the level where we could find it to be plain error, Gaines was not placed twice in jeopardy.
 IV {¶ 53} Gaines next argues that the court erred by denying his Crim.R. 29(A) motion for judgment of acquittal because the state failed to present sufficient evidence to sustain a conviction on the murder count, and hence the remaining counts must "fold like a house of cards."
 {¶ 54} "Pursuant to Criminal Rule 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." State v.Bridgeman (1978), 55 Ohio St.2d 261, syllabus. On appeal, we examine the evidence submitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 55} We began this opinion by noting that the state presented a case comprised of circumstantial evidence. Circumstantial evidence is the proof of certain facts or circumstances in a given case, from which the trier of fact may infer other connected facts that would reasonably follow. Circumstantial evidence carries the same weight as direct evidence. Jenks, at paragraph one of the syllabus. In fact, in some cases circumstantial evidence can be more certain, satisfying and persuasive than direct evidence. Michalic v. Cleveland Tankers, Inc. (1960),364 U.S. 325, 330, citing Rogers v. Missouri Pacific RR. Co. (1957),352 U.S. 500, 508.
 {¶ 56} In order to prove a charge of murder, the state must establish that Gaines purposely caused the victim's death. See R.C.2903.02(A). To do this, it established Gaines as a jealous man who knew that his girlfriend was involved with another man. His jealousy was such that he threatened both her and her lover. The threats were made in letters and in person to a handyman who worked for the victim. The state placed Gaines in the victim's house on the day of her death, with several witnesses claiming that he used her car. Although no one saw the shooting, a witness saw the victim's car leave the house about twenty minutes after the shooting. When the police found the car, the occupants said that Gaines had traded them the car for crack cocaine.
 {¶ 57} Reviewing these facts in a light most favorable to the state leads us to conclude that reasonable minds could find the natural inferences to be drawn from these facts were that Gaines purposely killed the victim. Gaines' written and verbal threats, his long-simmering jealousy of the victim's relationship with Fagan, his opportunity to commit the crime, and his possession of the car so soon after the murder, all establish the elements of murder. And as Gaines concedes in his brief, the establishment of the elements of murder by circumstantial evidence necessarily establish the required elements of the remaining counts of tampering with evidence (cleaning the premises after the murder), aggravated robbery (taking the victim's purse) and having a weapon while under disability.
 {¶ 58} The last remaining count is grand theft motor vehicle. R.C.2913.02(A)(1) states that no person, with purpose to deprive the owner of property, shall knowingly obtain or exert control over the property without the consent of the owner. The question for us is whether reasonable minds could reach different conclusions on whether these elements were established by the evidence.
 {¶ 59} The state attempted to show that Gaines took the vehicle without the victim's permission in two ways: by evidence that the victim made it her habit to deny him personal use of her car and by testimony that she would not let him use the car for personal reasons on the day of the murder. We have rejected as incompetent evidence the state's attempt to show that it was the victim's habit to deny Gaines the personal use of her car, so the state could not establish the absence of consent with that testimony.
 {¶ 60} The question then becomes whether reasonable minds could differ on whether the state established a lack of consent to use the car on the day of the murder. The evidence showed that on the day of the murder, Gaines used the victim's car with her permission. When Gaines returned, the victim did not ask for her keys back. Admittedly, the jury could not know whether the victim subsequently demanded the return of her keys, so it may be open to question whether she continued to deny Gaines the personal use of her car. But that is a digression, for any permission that the victim may have given Gaines on the day of the murder necessarily evaporated once he murdered her.
 {¶ 61} While the state has the affirmative obligation to establish the contours of the victim's consent to use the car, it did not need to establish proof of what the victim may have told Gaines on the day of the murder. The evidence showed that the victim did not own the car — Fagan did — and she used it only with Fagan's consent. That consent necessarily ended once the victim died, and along with her death went her right to give Gaines consent to the use of the vehicle. Once the victim had been murdered, the right of consent reverted to its true owner, Fagan. Fagan testified that he did not give Gaines his consent to drive the car. The jury could thus believe that Gaines did not have Fagan's consent to use the vehicle after the victim's murder. That being the case, we find the court did not err by refusing to grant the motion for judgment of acquittal.
 V {¶ 62} Gaines' final assignment of error is that the verdicts are against the manifest weight of the evidence. Keeping in mind that the weight of the evidence and credibility are primarily for the trier of fact, State v. DeHass (1967), 10 Ohio St.2d 230, we find no reason to restate the facts previously cited in this opinion. The state presented evidence of motive and opportunity, and Gaines' possession of the victim's car after the murder speaks volumes, especially since that car was seen leaving the scene after gunshots were heard. Gaines points out that the crime scene was a bloody mess, and that his shoes bore no traces of blood. This is true, but the police did not find Gaines until three days after the murder, so he likely had the opportunity to change his shoes or remove any traces of blood in the interim.
 {¶ 63} At any rate, the standard of review on questions concerning the weight of the evidence is such that we cannot substitute our judgment merely because we think the jury was wrong. And we see nothing wrong with the verdict.
 {¶ 64} The judgment is affirmed.
Judgment affirmed.
Kenneth A. Rocco, A.J., and James J. Sweeney, J., concur.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.