[Cite as *State v. Tolliver*, 2026-Ohio-1652.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 115496 |
| JOSHUA TOLLIVER, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 7, 2026

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-695929-A

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney and Gregory J. Ochocki, Assistant Prosecuting
Attorney, *for appellee.*

Jeffrey S. Richardson, *for appellant.*

MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant Joshua Tolliver ("Tolliver") appeals the decision of the Cuyahoga County Court of Common Pleas denying his motion to dismiss his case based on double jeopardy grounds. After careful review of the record, we affirm.

## I. Facts and Procedural History

{¶ 2} In October 2024, Tolliver and codefendant, Jeshawn Darby ("Darby"), were indicted in connection with the murder of Jaylin Perry ("Perry"), which occurred on April 2, 2023, in Cleveland, Ohio. Tolliver and Darby were charged with one count of aggravated murder, two counts of murder, two counts of felonious assault, one count of receiving stolen property (motor vehicle), and one count of improperly handling firearms in a motor vehicle. The murder and felonious assault counts contained one-, three-, and five-year firearm specifications. The receiving stolen property count included one- and three-year firearm specifications. Tolliver was also charged with an additional count of improperly handling firearms in a motor vehicle, two counts of having weapons while under disability, one count of involuntary manslaughter, two counts of tampering with evidence, and one count of failure to comply with an order or signal of police officer. The additional counts included the date of the murder, as well as two additional dates. One date covered the disposal of evidence of the murder, and one date involved a police chase where a handgun was thrown from the vehicle. Tolliver was also charged with notice-of-prior conviction and repeat-violent-offender specifications.

{¶ 3} Tolliver and Darby pled not guilty and discovery ensued. Numerous pretrials were conducted, and a trial date of March 31, 2025, was set. On March 5, 2025, the parties learned that the gun recovered from the police chase of Tolliver did not match the shell casings recovered at the murder scene as originally

suspected.  On March 13, 2025, the trial date of March 31, was rescheduled to May 27, 2025, at the joint request of the defense and the State.

{¶ 4} In early April 2025, the record reflects that the State and the defense were working on a technology issue involving video footage.  In early May 2025, Tolliver filed a motion to sever the counts pertaining to the police chase.  The motion was unopposed and granted by the trial court.

{¶ 5} The May 27 trial date was continued to June 11, at the State's request, because the prosecutor was engaged in trial on a different case.  At this time, the State indicated to the trial court that discovery was complete, except for cell phone records pertaining to the severed counts.  Additionally, a second trial date of June 30, 2025, was also scheduled if the June 11 date was not feasible.  Ultimately, trial commenced on June 30, 2025, because the State was in trial on another case on June 11.

{¶ 6} During opening statement, the State indicated that Tolliver and Darby were observed on video getting in and out of the black Dodge Challenger alleged to be involved in the drive-by shooting of Perry.  The vehicle was parked outside Tolliver's apartment complex just prior to the shooting and Tolliver's iPhone was connected to the vehicle's Bluetooth just prior to the time of the shooting.

{¶ 7} Tolliver argued, during opening statement, that there was no evidence connecting him to the murder.  He argued that the State could not put Tolliver in the vehicle at the time of the murder and did not recover the murder

weapon. Tolliver implied that the police targeted Tolliver because of a previous incident that was alleged to have happened between Tolliver and Perry.[1]

{¶ 8} Before the start of the third day of trial, Darby pled guilty to the charges of receiving stolen property (motor vehicle) and tampering with evidence because the video footage proved he could not have been in the vehicle at the time of the shooting. Up until that day, the State experienced technical difficulties with the video footage and the accuracy of the times associated with the video. According to the record, the plea agreement did not involve testimony against Tolliver.

{¶ 9} After Darby's plea, Tolliver moved for a mistrial. He argued that by Darby pleading guilty midtrial, the jury would assume that the evidence against Darby was strong and by extension it was strong against Tolliver. The State opposed the motion for mistrial, arguing that when a codefendant pleads guilty midtrial, the jury is not informed of the plea and instructed not to consider why the codefendant is no longer at the trial table. The trial court denied Tolliver's motion, and trial resumed.

{¶ 10} That same day, during the lunch break, the State received an email from the detective, which included a DNA report authored July 1, 2025, by the Cuyahoga County Regional Forensic Science Laboratory. The DNA report revealed

---

[1] We note that in a defense filing it is alleged that a 2020 police report indicates that Perry may have shot Tolliver, possibly in self-defense, during an attempted robbery. Perry's girlfriend testified during trial that Perry had a long-standing feud with someone named Joshua, but she did not know who Joshua was or what he looked like.

that Darby's DNA was in the front-seat area of the vehicle, but Tolliver's DNA was not found in the vehicle. The report was immediately forwarded to Tolliver's counsel.

{¶ 11} The next day, July 3, 2025, Tolliver again moved for a mistrial based on Darby's plea, as well as the late disclosure of the DNA report, asserting that this information would have changed Tolliver's trial strategy. The State again opposed the motion for mistrial. The trial court granted Tolliver's motion for mistrial and dismissed the jury. A new trial date was set.

{¶ 12} On July 29, 2025, Tolliver filed a motion to dismiss the charges against him arguing that the State manipulated the defense into requesting a mistrial. Tolliver insisted that the State offered a plea agreement to Darby to discredit Tolliver's defense and to "so deeply prejudice Mr. Tolliver that he ha[d] no choice but to move for a mistrial." (Motion to Dismiss, July 29, 2025.) He contended that the State "re-opened" discovery after telling the trial court that discovery was complete, including collecting DNA from Tolliver shortly after the first trial date. He also alleged that the State purposely waited to disclose the DNA results to cause prejudice to Tolliver. He argued that although the State objected to the motion for mistrial, the State "would have been just as happy to continue trial under the extreme prejudice to Mr. Tolliver created by its own prosecutorial misconduct." (Motion to Dismiss, July 29, 2025.)

{¶ 13} The State filed a brief in opposition to Tolliver's motion to dismiss on August 8, 2025. The State explained that the parties experienced significant

technical difficulties regarding the correct sequencing of the video footage and it was resolved during trial, which led to the plea offer to Darby. Based on the timing in the video footage, there was evidence that Darby could not have been in the vehicle at the time of the shooting. The State also explained that Tolliver's DNA was collected for multiple reasons, including the counts that were severed for trial, and other investigations. The State explained that it has no control over when DNA test results are completed and the State forwarded the DNA results to Tolliver's attorney within minutes of receiving it.

{¶ 14} The trial court denied Tolliver's motion to dismiss, finding:

The State of Ohio's conduct was not intentionally calculated to cause or invite a mistrial. Although the State of Ohio represented to the trial court that discovery was complete, they did inform all parties that additional discovery was received during the course of trial. The State of Ohio indicated that the discovery was immediately turned over to the defense. (Although the court did find that this discovery could have changed the defendant's trial strategy, how they questioned witnesses, and how they proceeded, and as such, the motion for mistrial was granted.)

(Journal Entry, Aug. 25, 2025.) It is from this ruling that Tolliver now appeals, raising one assignment of error for our review:

The trial court erred by denying [Tolliver's] Motion to Dismiss the charges based on the State's violation of the Double Jeopardy Clause by engaging in repeated instances of prosecutorial misconduct committed for the purpose of leaving [Tolliver] with no alternative but to move for mistrial.

## II. Law and Analysis

### A. Standard of Review

{¶ 15} We note that "[t]he denial of a motion to dismiss on double jeopardy grounds is a final appealable order subject to immediate appellate review." *Cleveland v. Jones*, 2017-Ohio-7320, ¶ 11 (8th Dist.), citing *State v. Anderson*, 2014-Ohio-542, ¶ 26. "Appellate courts apply a de novo standard of review when reviewing the denial of a motion to dismiss an indictment on the grounds of double jeopardy." *State v. Anderson*, 2016-Ohio-5791, ¶ 20.

### B. Double Jeopardy

{¶ 16} The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution states that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb[.]" The Fifth Amendment was made applicable to the states through the Fourteenth Amendment. *Oregon v. Kennedy*, 456 U.S. 667, 671 (1982). Additionally, Article I, Section 10 of the Ohio Constitution, which states "[n]o person shall be twice put in jeopardy for the same offense[,]" protects a criminal defendant from multiple prosecutions for the same offense. *State v. Kareski*, 2013-Ohio-4008, ¶ 14. The policy underlying this protection is to ensure that

> "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."

*U.S. v. Jorn*, 400 U.S. 470, 479 (1971), quoting *Green v. U.S.*, 355 U.S. 184, 187-188 (1957).

### C. Retrial is Not Prohibited

{¶ 17} Generally, there are no double jeopardy considerations when a mistrial is declared. *N. Olmsted v. Himes*, 2004-Ohio-4241, ¶ 36 (8th Dist.), citing *State v. Gaines*, 2003-Ohio-6855 (8th Dist.) If a defendant's motion for mistrial is granted, or the trial court sua sponte declares a mistrial, the State is usually not precluded from retrying a criminal defendant. *Id.*, citing *United States v. Tateo*, 377 U.S. 463, 467 (1964); *State v. Loza*, 71 Ohio St.3d 61, 70 (1994). However, a narrow exception to this rule applies when a defendant's request for a mistrial was precipitated by prosecutorial misconduct intended to elicit the defendant to seek a mistrial. *State v. Truhlar*, 2016-Ohio-5338, ¶ 34 (8th Dist.), citing *Himes*, at ¶ 36-37.

{¶ 18} As this court explained in *Himes*:

[A] narrow exception to this rule applies when the defendant's request or the judge's actions are prompted or instigated by prosecutorial misconduct designed to goad the defendant into seeking a mistrial. *Oregon v. Kennedy*, 456 U.S. at 676; *State v. Glover* (1988), 35 Ohio St.3d 18, 517 N.E.2d 900.

"Prosecutorial misconduct, by itself, is not enough to trigger the exception to the Double Jeopardy Clause — the state must intend 'to subvert the protections afforded by the Double Jeopardy Clause.' *Kennedy*, supra, 456 U.S. at 675. In other words, only conduct 'intentionally calculated to cause or invite mistrial' will bar retrial. *United States v. Thomas* (C.A.6, 1984), 728 F.2d 313, 318." *State v. Girts* (1997), 121 Ohio App.3d 539, 551, 700 N.E.2d 395.

*Himes* at ¶ 37-38.

{¶ 19} When determining whether the requisite prosecutorial intent was present, this court may consider the following factors: (1) whether a sequence of overreaching existed prior to the single prejudicial incident, (2) whether the prosecutor resisted or was surprised by the defendant's motion for a mistrial, and (3) the findings of the trial court concerning the intent of the prosecutor. *Id.* at ¶ 39, citing *Kennedy*, 456 U.S. at 680 (Powell, J., concurring).

### 1. No Sequence of Overreach

{¶ 20} In the instant case, Tolliver argues that the State attempted to continue the trial date numerous times apparently suggesting that the continuance requests were an overreach by the State. The record, however, is clear that the first trial date was continued at both the State's and the defense's request and the subsequent requests were because the prosecutor was already engaged in trial. Because a person cannot be in two courtrooms at once, we find that requesting a continuance is not an overreach.

{¶ 21} Next, Tolliver asserts that the late collection of DNA from Tolliver, as well as the late disclosure of the DNA test results, which was exculpatory for Tolliver and inculpatory for Darby, "served no benign purpose." (Tolliver brief, p. 11.) The DNA test results indicated that Darby's DNA was found in the driver side of the vehicle allegedly used in the murder, but Tolliver's DNA was not found in the vehicle. Tolliver appears to argue that the delay in turning over the DNA test results was calculated to cause a mistrial. Tolliver asserts that the facts in his case are similar to the facts in *State v. Mattison*, 2008-Ohio-4090 (8th Dist.).

{¶ 22} We find the facts in *Mattison* distinguishable from the facts in this case. In *Mattison,* the defendant was charged with felonious assault for hitting the victim in the head with a brick after the victim exited a store. On cross-examination the victim testified that the defendant was outside the store "24 hours a day, seven days a week." *Id.* at ¶ 3. On redirect, the State questioned what the victim meant by his statement, "24 hours a day, seven days a week." The victim replied that the defendant was a drug dealer. The defendant moved for a mistrial, which was granted by the trial court finding that State provoked a mistrial by asking the question because the State's case was "going south." *Id.* at ¶ 4. The State appealed.

{¶ 23} This court affirmed the dismissal with prejudice concluding that based on the record it was clear that the victim's credibility was at issue, the evidence was inadmissible, and "the state knew that the question would lead the jury to conclude that Mattison was a drug dealer, regardless of whether the victim actually answered it." *Id.* at ¶ 11. This court found that there was "no benign purpose" for the State's question and "the state engaged in trial by innuendo, thus goading Mattison's motion for mistrial." *Id.*

{¶ 24} In the instant case, the State did not knowingly illicit testimony in front of the jury that would goad Tolliver into moving for a mistrial. Rather, the State disclosed newly acquired evidence to defense counsel as is required by *Brady v. Maryland,* 373 U.S. 83 (1963), and Crim.R. 16(A). Indeed, Crim.R. 16(A) states that the purpose of the rule "is to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the

integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large. All duties and remedies are subject to a standard of *due diligence*, apply to the defense and the prosecution equally, and are intended to be reciprocal. Once discovery is initiated by demand of the defendant, all parties have a *continuing duty* to supplement their disclosures." (Emphasis added.)

{¶ 25} Here, the record reflects that DNA was collected for multiple reasons, including the severed counts related to Tolliver where a handgun was recovered, as well as other investigations related to Tolliver. Although Tolliver accuses the State of waiting 24 hours to disclose the DNA report, the record reflects that it was turned over within minutes of the State receiving the results in accordance with Crim.R. 16(A). We also note that the detective, who likely was sitting at the trial table with the prosecutor, received the DNA report first by email and then forwarded the results to the prosecutor presumably when the detective viewed the email. The record also indicates that the DNA report was authored July 1, 2025, and in the hands of the State and Tolliver during lunch break on July 2, 2025. It is unclear when the detective received the email or viewed the email, but we can hardly say that the State or the detective waited to disclose the DNA results for some nefarious reason or to goad Tolliver into moving for a mistrial.

{¶ 26} Next, Tolliver insists that the State was attempting to "completely discredit Mr. Tolliver's defense by offering [Darby] a sweetheart deal." (Tolliver brief, p. 12.) Tolliver fails to cite any caselaw to support his contention.

{¶ 27} In *State v. Davis*, 2019-Ohio-4692 (10th Dist.), the Tenth District found that the trial court did not abuse its discretion when it denied defendant's request for a mistrial after the codefendants pled guilty midtrial. The *Davis* Court found that a curative instruction was sufficient to correct any potential prejudice to the defendant arising out of the codefendants accepting pleas midtrial. *Id.* at ¶ 34. *See also State v. Hollins*, 2020-Ohio-4290 (8th Dist.) (citing *Davis*, and finding that the trial court did not abuse its discretion when it denied defendant's motion for mistrial after a codefendant pled guilty midtrial).

{¶ 28} Contrary to Tolliver's assertion, the record reflects that the State was able to determine that Darby was not in the vehicle during the murder and offered Darby a plea agreement in accordance with the evidence. That plea did not include testimony against Tolliver. Moreover, it is unclear how Darby's pleading guilty undermined Tolliver's defense when his defense was that it was not him and there was no evidence connecting him to the murder, which was only bolstered by the then empty chair previously occupied by Darby.

### 2. The State Objected to the Motion for Mistrial

{¶ 29} Tolliver argues that although the State objected to a mistrial, it was the State's goal to goad him into requesting a mistrial. Again, we disagree with Tolliver's assessment of the State's motives.

{¶ 30} In the instant case, when Tolliver requested a mistrial, the prosecutor specifically stated:

> I confess I have not recently looked up the law on [motions for mistrial] but I certainly have had it happen before where one or more defendants will engage in a plea agreement mid-trial after a jury has been seated. I've never had a mistrial granted in that circumstance. I can't think of a case where that became an assignment of error on appeal, but I am happy to look for a case.

(Tr. 426.) Further, when Tolliver requested a mistrial the following day, the State was armed with caselaw and thoroughly argued against it.

{¶ 31} In *Himes*, the defendant requested a mistrial after the prosecutor asked a question to an officer that elicited a response that could be construed by the jury that the defendant had a prior conviction for driving under the influence ("DUI"). *Himes*, 2004-Ohio-4241. While at sidebar, the trial court revealed that the defendant did in fact have a prior conviction for DUI, which was unknown to the prosecutor as well as defense counsel. *Id.* at ¶ 13. The defendant then withdrew his motion for mistrial and requested a curative instruction. The prosecutor, however, insisted on a mistrial. The trial court granted the mistrial. Thereafter, the defendant filed a motion to dismiss on double jeopardy grounds, which was denied by the trial court. *Id.* at ¶ 14-19. This court found that the State did not goad the defendant into requesting a mistrial, there was no sequence of overreach, and the prosecutor initially opposed the request for mistrial. *Id.* at ¶ 40-41. Nevertheless, this court reversed the trial court's denial of defendant's motion to dismiss on double jeopardy grounds finding that the trial court abused its discretion when it granted a mistrial because no manifest necessity existed to warrant a mistrial. *Id.* at ¶ 45-46. Rather

than a mistrial, a curative instruction, which was suggested by the defense, would have sufficed. *Id.*

{¶ 32} Again, in the instant case, the State did not elicit improper testimony or goad Tolliver into requesting a mistrial. Further, the State did not request a mistrial and argued against granting a mistrial. Rather, it was Tolliver who insisted on the mistrial. Therefore, we find that there is no evidence that the State intentionally caused or invited a mistrial.

### 3. The State did Not Intend to Cause a Mistrial

{¶ 33} Finally, we independently review the trial court's findings that the State did not intend to cause a mistrial. Tolliver argues that this is not a situation where the State asked the wrong question or played the wrong video in trial, but rather, "[t]his was a calculated exercise of prosecutorial discretion designed to so prejudice Mr. Tolliver [so that] he had no choice but to request a mistrial." (Tolliver's brief, p. 13.)

{¶ 34} Again, we find no merit to Tolliver's contention. Codefendants plead guilty, sometimes midtrial. Surely, Tolliver is not suggesting that Darby not be offered a plea bargain when evidence comes to light that he is not involved. Undoubtedly, Tolliver would expect a plea offer or dismissal if evidence came to light that he was not involved.

{¶ 35} Furthermore, we find no merit to Tolliver's argument that the State somehow delayed the DNA testing or the results. Although there is a misconception that DNA results can be achieved during a commercial break, this is simply not true.

Furthermore, every governmental agency is constrained by the same things, rules, funding, equipment, and staff. In addition, it is burdened by an overabundance of requests. No doubt the State would prefer to have all the evidence available prior to trial, but it is not always feasible and a defendant's right to speedy trial weighs in the balance with every single delay.

{¶ 36} After reviewing the factors set forth in *Himes*, we find that there was no sequence of overreaching by the State that existed prior to the single prejudicial incident; the prosecutor resisted Tolliver's motions for mistrial; and we agree with the findings of the trial court concerning the intent of the prosecutor. Therefore, after a thorough review of the record, we find, as did the trial court, that "[t]he State of Ohio's conduct was not intentionally calculated to cause or invite a mistrial." (Journal Entry, Aug. 25, 2025.)

{¶ 37} Accordingly, Tolliver's sole assignment of error is overruled.

{¶ 38} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The appellant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

EMANUELLA D. GROVES, P.J., and
SEAN C. GALLAGHER, J., CONCUR