[Cite as *State v. Isom*, 2025-Ohio-604.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

| | |
|---|---|
| STATE OF OHIO, | CASE NO. 2024-T-0043 |
| Plaintiff-Appellee, | |
| - vs - | Criminal Appeal from the Court of Common Pleas |
| DANNY L. ISOM, | |
| Defendant-Appellant. | Trial Court No. 2023 CR 00794 |

**O P I N I O N**

Decided: February 24, 2025
Judgment: Affirmed

*Dennis Watkins*, Trumbull County Prosecutor, and *Ryan J. Sanders*, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481 (For Plaintiff-Appellee).

*Walter H. Edwards, Jr.* and *Erin E. Hanson*, 323 West Lakeside Avenue, Suite 200, Cleveland, OH 44113 (For Defendant-Appellant).

JOHN J. EKLUND, J.

{¶1} Appellant, Danny L. Isom, appeals the judgment of conviction from the Trumbull County Court of Common Pleas after a jury trial where he was found guilty of one count of Felonious Assault with a firearm specification, a second-degree felony in violation of R.C. 2903.11(A)(2) and 2941.145.

{¶2} Appellant has raised five assignments of error arguing that the trial court erred by allowing improper other-acts evidence to be admitted; that he received ineffective assistance of counsel; that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence; and that the State

committed prosecutorial misconduct by testifying through its cross-examination of Appellant's sole witness.

{¶3} Having reviewed the record and the applicable caselaw, we find Appellant's assignments of error to be without merit. First, although the trial court permitted the State to introduce other-acts evidence, it did so in accordance with Evid.R. 404(B) and Evid.R. 403(A). Second, trial counsel did not render ineffective assistance of counsel. Next, Appellant's conviction and the accompanying firearm specification were supported by sufficient evidence and were not against the manifest weight of the evidence. Finally, the questions the prosecutor asked were appropriate leading questions that went directly to whether Appellant's witness had related certain details to which she testified when she came to the prosecutor's office before trial.

{¶4} Therefore, the judgment of the Trumbull County Court of Common Pleas is affirmed.

**Substantive and Procedural History**

{¶5} Appellant was initially charged in the Warren Municipal Court and, on November 29, 2023, Appellant was indicted by the Trumbull County Grand Jury on one count of Felonious Assault, a second-degree felony in violation of R.C. 2903.11(A)(2), with a firearm specification pursuant to R.C. 2941.145.

{¶6} Appellant pled not guilty, and the matter proceeded to jury trial on April 29, 2024. The following facts and evidence were adduced at trial:

{¶7} The State called Officer William Fowler of the Warren City Police Department. Officer Fowler testified that on August 25, 2023, he responded to a call for a shooting in the 1900 block of Hazelwood Avenue in Warren, Ohio. He arrived at the

2

scene and saw a crowd of people standing around a male sitting on a milk crate. He said the victim, later identified as Eddie Pierce, was bleeding badly with a shirt wrapped around his arm as a tourniquet. Pierce guessed that he had been shot ten times. Pierce initially was unsure about who shot him, but Officer Fowler said that someone in the crowd "yelled out the name, I think it was either 'D' or 'Danny,' if I remember correctly." However, that witness, Deshannon Love, had not seen the shooting. Officer Fowler said the suspect was described as a "tall, thin, black male, possibly with a beard, and then possibly wearing white." Officer Fowler said Pierce was faint and appeared like he was close to passing out before the EMTs came and transported him to the hospital. The State introduced both audio and visual from Officer Fowler's body camera into evidence.

{¶8} The next witness, Detective Eric Laprocina of the Warren Police Department, testified that he arrived on the scene of the shooting and began his investigation. He said the shooting took place in a large parking lot in an apartment complex. He recovered five cartridge casings from a handgun on the north side of the parking lot. One of the casings had suspected blood on the casing itself. He also found the deformed fragment of a projectile and a freshly smoked cigarette. Detective Laprocina observed a blood trail that led away from where he initially discovered the cartridge casings and ended at the milk crate where Pierce was found. The State introduced the photographs Detective Laprocina took of the crime scene.

{¶9} Deshannon Love testified that she is Pierce's cousin and that she lives in the apartment complex where the shooting took place. She said that she had known Appellant for about a year and that he went by "D" in the neighborhood. On the day of the shooting, Love did not notice any issue between Appellant and Pierce. She also said that

3

Pierce was not a quarrelsome person. She said that Pierce stepped out of her building to go lock his house up three buildings down from her unit and she heard gunshots and ran outside. She saw Pierce lying on the ground. Love said that Pierce "looked straight up at me and said, 'D' shot me." She said she knew this meant that it was Appellant. Love said that Pierce looked to be in shock and was bleeding, so she took her shirt off and tied it around his arm.

{¶10} Pierce testified that, on the day of the shooting, a burgundy car pulled into the parking lot and parked in front of Love's house. He said that Appellant and Leanthony Brown were in the car. Pierce was concerned and felt something was not right, so he left her house to check. He heard a sound, turned around, and saw Appellant. Appellant aimed a gun at him and shot him five times before he fell to the ground. Once on the ground, Appellant shot him again several times. Pierce said he was hit in the face, forehead, shoulder, and arms. He said he lost use in his arms and hands from his injuries and was in the hospital for five days. Pierce said that he was smoking a cigarette when he was shot and denied that Appellant had a cigarette. Pierce said that any inconsistencies in his account of what happened were because he had just been shot and was severely injured. He also said that he did not immediately tell the police who shot him because "I wanted to hurt him."

{¶11} Pierce said he only knew Appellant as "D" and only knew him through Love. He said that he got a good look at the shooter and was 100 percent sure it was Appellant. Pierce said that he and Brown did not have any beef with each other and that Leanthony has vision problems that would make it difficult for him to shoot anyone. However, he also acknowledged that Appellant had no apparent reason to shoot him.

4

{¶12} Leanthony Brown testified that at the time of the shooting, he was living in the same complex where Pierce and Love where living. He said he did not really know Pierce but said the two had no issues and were friendly. He said that his daughter, Tanea Brown, and Appellant came to his house and said they would take him to the store. However, before leaving the apartment complex, Tanea went inside her house to get something. When she came back, she pointed out Pierce, and Appellant "jumped out the car, ran around there, and I heard gunshots." Leanthony said that Pierce returned to the car and "we took off." Leanthony asked Appellant what had happened, and Appellant said that he shot Pierce.

{¶13} The next day, Leanthony said that his girlfriend called to warn him that he needed to get out of the house because "they was gonna shoot my house up because I used to hang with Eddie [Pierce], because Eddie was coming over my house a lot." Leanthony and his girlfriend then stayed with a friend in Cleveland for a while. However, Leanthony said that Appellant came to Cleveland and that he, Appellant, and Tanea went driving around town for a few hours. After driving around, Leanthony said that Appellant put a gun to his head and said, "I should blow your head off right now. . . . The only reason I don't do it 'cause we in front of Mr. Willy house and your daughter is sitting right there." Leanthony said Appellant threatened him because Appellant was concerned Leanthony would "tell on" him for shooting Pierce. Leanthony noted that his daughter Tanea was romantically involved with Appellant.

{¶14} Leanthony said that Appellant drove a burgundy Chrysler 200 or similar-style sedan. Leanthony denied that he put a 9-millimeter firearm in the center console of Appellant's vehicle while they were driving around. He said that he had been sitting in the

5

back seat and could not have placed anything in the console. He also said that, despite being legally blind, he could identify Appellant's firearm because it had been placed right in his face.

{¶15} Leanthony said that the next day, Appellant shot him in the leg. Appellant's counsel objected to the introduction of this evidence as other-acts character evidence, but the court overruled the objection, noting that Leanthony had already testified without objection to being threatened and said the issue could be pursued on cross-examination. On cross-examination, Leanthony denied having a gun or shooting at Appellant first.

{¶16} Officer Thomas Kazimer of the Solon Police Department said that on August 30, 2023, he conducted a traffic stop on a maroon Nissan Altima for extremely dim headlights. Appellant was driving the vehicle, and Tanea Brown was the passenger. Officer Kazimer conducted a probable cause search of the vehicle and discovered a Taurus 9-millimeter handgun in the center console of the vehicle. Solon Dispatch stated the gun had been reported stolen through the Warren Police Department.

{¶17} Detective Frank Tempesta of the Warren Police Department testified. He said he was assigned to investigate the shooting. He spoke to Pierce at the hospital but said that Pierce was initially uncooperative. Detective Tempesta spoke to Piece for a third time after he had been discharged from the hospital. At that time, Pierce cooperated and conducted a taped interview at the Warren Police Department. Based on that interview, Detective Tempesta proceeded with Appellant as a suspect and reached out to the Solon Police Department in reference to their arrest and recovery of the firearm to determine if it was the same firearm used in the shooting. He received the seized firearm and sent it

6

to the Ohio Bureau of Criminal Investigation (BCI) to test it for a match to the recovered ballistic materials from the day of the shooting.

{¶18} The State called Regan Lambert, a forensic scientist in the firearms section of BCI. She said that she performed firearms identification on the submitted firearm that had been recovered in the Solon arrest and compared that firearm to the five cartridge casings recovered from the scene of the shooting. She was able to determine that all five recovered cartridge casings had been fired from the recovered firearm.

{¶19} The State rested, and Appellant made a Crim.R. 29 motion for acquittal, which the trial court denied.

{¶20} Appellant called Tanea Brown. She testified that she and Appellant had been engaged but said they are no longer together. She said that on the day of the shooting, she saw her father Leanthony arguing with a man known to her as Paris about Italian sausages. She was irritated about the argument and left. She came back a few hours later, and her father was arguing with Paris and Pierce. She said they pulled firearms on each other. She said her stepmother, Renee, brought Leanthony inside and that Leanthony said he was going to kill him. Tanea said that by this, Leanthony meant "Paris and Eddie, either or."

{¶21} Tanea said that Leanthony was not legally blind and did not have vision troubles. She said she saw him carrying a 9-millimeter handgun on the day of the shooting and identified that firearm in evidence as the same one she saw him using and as the same gun found in the center console of the vehicle. She said that Leanthony had stolen that gun from her ex-boyfriend.

7

{¶22} Tanea said that she did not see the shooting take place. On cross-examination she acknowledged that she had gone to the Warren Police Department to talk about the shooting. She and the prosecutor engaged in the following exchange:

Q    And you never told them the story [about the three men pulling guns on each other] that you told today on the stand, did you?

A    Yes.

. . .

Q    Actually, you came to my office one day and you told me you wanted to talk to me about the case; is that correct?

A    Correct.

Q    And I talked to you about it; right?

A    Yes.

Q    You didn't tell me this story, did you?

{¶23} At this point, Appellant's trial counsel objected, arguing the prosecutor was acting as a witness. The trial court overruled the objection saying the line of questioning "goes straight to credibility."

{¶24} The prosecutor continued to ask her about what she said during the meeting, asking "did you tell me anything about these three gentlemen pulling guns on each other? . . . So you don't remember telling me that, is what you're saying?" Tanea agreed with that characterization and agreed that this information would have been "important" to tell.

{¶25} The jury found Appellant guilty of Felonious Assault with the firearm specification.

{¶26} On May 8, 2024, Appellant filed a motion for a new trial.

8

Case No. 2024-T-0043

{¶27} On May 9, 2024, the trial court sentenced Appellant to a minimum of eight years and a maximum of 12 years in prison on the Felonious Assault count with an additional three years in prison for the firearm specification, for an aggregate sentence of 11-15 years in prison. The trial court also denied Appellant's motion for a new trial.

{¶28} Appellant timely appealed raising five assignments of error.

### Assignments of Error and Analysis

{¶29} Appellant's first assignment of error states: "THE TRIAL COURT ERRED BY VIOLATING APPELLANT'S DUE PROCESS RIGHTS UNDER THE FEDERAL AND STATE CONSTITUTIONS BY ALLOWING OTHER ACTS EVIDENCE."

{¶30} Appellant argues the trial court should not have allowed Leanthony Brown to testify that Appellant held a gun to his head, threatened him, and ultimately shot him. He states that this testimony violated Evid.R. 404(B) and R.C. 2945.59 because it portrayed Appellant as "the type of person who would have committed the shooting because he allegedly continued to engage in such behavior after the incident in question."

{¶31} Evid.R. 404(A) is a general prohibition on using evidence of a person's character to prove he or she acted "'in conformity therewith on a particular occasion.'" *State v. Graham*, 2020-Ohio-6700, ¶ 71. Evid.R. 404(B)(1) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove the person's character in order to show that on a particular occasion the person acted in accordance with the character." Evid.R. 404(B)(2) provides that "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

9

Case No. 2024-T-0043

**{¶32}** The admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law. *State v. Hartman*, 2020-Ohio-4440, ¶ 22. A trial court is precluded from admitting improper character evidence under Evid.R. 404(B), but it has discretion to allow other-acts evidence that is admissible for a permissible purpose. *Graham* at ¶ 72.

**{¶33}** Other-acts evidence is admissible pursuant to the following three-step analysis: the first question is whether the "evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *State v. Williams*, 2012-Ohio-5695 ¶ 20, citing Evid.R. 401. Second, the court must "consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether [it] is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)[2]." *Id.* Finally, the court must "consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." *Id.,* citing Evid.R. 403.

**{¶34}** "Evidence of other acts may not be used to prove by inference that the accused acted in conformity with those other acts or that he [or she] has a propensity to act in that way." *State v. Worley*, 2021-Ohio-2207, ¶ 118; Evid.R. 404(B)(1). "Other-acts evidence may be admissible for nonpropensity purposes—i.e., as 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *Worley* at ¶ 118; *see* R.C. 2945.59 ("any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved . . .,

10

Case No. 2024-T-0043

notwithstanding that such proof may show or tend to show the commission of another crime by the defendant").

**{¶35}** "To justify the admission of other-acts evidence for a nonpropensity purpose, the evidence must pertain to a '"material" issue that is actually in dispute.'" *Worley* at ¶ 118, quoting *Hartman*, 2020-Ohio-4440, ¶ 27, quoting *Huddleston v. United States*, 485 U.S. 681, 686 (1988).

**{¶36}** In *State v. Echols*, 2024-Ohio-5088, the Supreme Court of Ohio recently offered guidance for how to analyze other-acts evidence "consisting of actual or attempted witness intimidation." *Id.* at ¶ 23. The Court said that "efforts at witness intimidation can fairly be described as a 'crime, wrong, or act.'" *Id.* at ¶ 25, quoting Evid.R. 404(B)(1). In *Echols*, "[t]he evidence did not directly show that Echols had committed the shooting. Rather, the State offered the evidence on the theory that Echols had sought to silence witnesses because he was conscious of his own guilt." *Id.*

**{¶37}** The Court determined as a matter of law that the trial court did not err in admitting such evidence because it was relevant for a non-propensity purpose because it served to establish consciousness of guilt. *Id.* at ¶ 32, 34.

**{¶38}** The Court also concluded the trial court did not abuse its discretion by admitting the evidence because the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *Id.* at ¶ 39. Despite being highly prejudicial evidence, the prejudice it caused was not unfair because the "efforts at witness intimidation had significant materiality to the State's case" that "reflected Echol's consciousness of his own guilt." *Id.* at ¶ 44.

11

Case No. 2024-T-0043

**{¶39}** The holding in *Echols*, 2024-Ohio-5088, informs our conclusion in this case. The trial court allowed testimony from Leanthony that Appellant put a gun to his head, that Appellant threatened him because he did not want Leanthony to "tell on" him, and that Appellant ultimately shot him. First, this evidence was relevant, as Appellant's purported attempts to cover up a prior act, to dissuade a witness from coming forward, or to cause harm to a potential witness all fall within the definition of intimidation of a witness as set forth in R.C. 2921.04(B)(2) ("No person, knowingly and by force or by unlawful threat of harm to any person or property or by unlawful threat to commit any offense or calumny against any person, shall attempt to influence, intimidate, or hinder . . . [a] witness to a criminal or delinquent act by reason of the person being a witness to that act[.]") The evidence of Appellant's attempts to intimidate Leanthony through both threats and force had the tendency to make Pierce's shooting more probable than without that evidence. Indeed, Leanthony's testimony explicitly stated that Appellant was concerned Leanthony would "tell on" Appellant for shooting Pierce. Therefore, Appellant's attempts at intimidation through both threats and force are relevant.

**{¶40}** Like in *Echols*, there is no question that this testimony was so-called "other acts" testimony as described in Evid.R. 404(B). However, Evid.R. 404(B)(2) permits the admission of other acts-evidence "for another purpose" such as demonstrating consciousness of guilt. In this case, Leanthony Brown stated that he went to Cleveland based on a fear of his house being shot up, and he described Appellant's actions attempting to intimidate him. These actions bear strongly upon Appellant's consciousness of guilt, and therefore the trial court did not err as a matter of law in allowing such testimony.

12

Case No. 2024-T-0043

**{¶41}** Next, the trial court did not abuse its discretion under Evid.R. 403(A). The testimony, although highly prejudicial, was also highly probative, and its probative value was not substantially outweighed by the danger of *unfair* prejudice.

**{¶42}** Finally, Tanea's testimony contradicted Leanthony's testimony about Appellant's threats and whether Leanthony carried a gun or shot at Appellant first. However, this conflicting testimony was a credibility issue for the jury to weigh and does not impact whether the testimony should not have been admitted. Although Appellant's trial counsel did not object to the admission of this testimony until Leanthony said that Appellant shot him, we find no error, plain or otherwise, in the admission of the witness-intimidation evidence. *See Echols*, 2024-Ohio-5088, at ¶ 28.

**{¶43}** Accordingly, Appellant's first assignment of error is without merit.

**{¶44}** Appellants second assignment of error states: "APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS RIGHTS UNDER THE FEDERAL AND STATE CONSTITUTIONS."

**{¶45}** Appellant next argues that trial counsel was ineffective for failing to object to the admission of aspects of Leanthony's testimony describing other acts evidence and trial counsel's failure to cross-examine Leanthony about whether he shot Pierce or had made statements admitting to shooting Pierce.

**{¶46}** In reviewing an ineffective assistance of counsel claim, the standard we apply is "'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *State v. Story*, 2007-Ohio-4959, ¶ 49 (11th Dist.), quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984). An appellant must demonstrate (1) counsel was deficient in some

13

aspect of representation, and (2) there is a reasonable probability, were it not for counsel's errors, the result of the proceedings would have been different. *Strickland* at 687, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694  A failure to "satisfy one prong of the *Strickland* test negates a court's need to consider the other." *State v. Madrigal*, 2000-Ohio-448, ¶ 49, citing *Strickland* at 697.

{¶47} An appellant "'must show that the attorney made errors so serious that he or she was not functioning as 'counsel' as guaranteed by the Sixth Amendment, and . . . that he or she was prejudiced by the deficient performance.'" *Story* at ¶ 49, quoting *State v. Batich*, 2007-Ohio-2305, ¶ 42 (11th Dist.). Ohio courts presume that every properly licensed attorney is competent, and therefore a defendant bears the burden of proof. *State v. Smith*, 17 Ohio St.3d 98, 100 (1985). "Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989). "Debatable trial tactics generally do not constitute a deprivation of effective counsel." *State v. Phillips*, 74 Ohio St.3d 72, 85 (1995). "'Failure to do a futile act cannot be the basis for claims of ineffective assistance of counsel, nor could such a failure be prejudicial.'" *State v. Henderson*, 2007-Ohio-2372, ¶ 42 (8th Dist.), quoting *State v. Shannon*, 1982 WL 5057, *2 (9th Dist. June 16, 1982).

{¶48} First, as we have found no error, plain or otherwise, in reference to the admission of Leanthony's other-acts testimony about Appellant's witness intimidation, we cannot conclude that trial counsel was deficient for not objecting to aspects of that testimony.

14

Case No. 2024-T-0043

{¶49} Second, trial counsel engaged in a thorough cross-examination of Leanthony. Counsel specifically asked Leanthony about whether he was carrying a firearm on the day of the shooting, asked if he placed the firearm in the center console of the car, and if he had fired a first shot at Appellant before Leanthony was shot. Leanthony had already specifically identified Appellant as shooting Pierce. However, trial counsel's series of questions were trial tactics meant to discredit Leanthony's testimony on direct examination and to create doubt about whether Leanthony had ulterior motivation for testifying against Appellant. This cross-examination strategy may have been designed, in concert with Tanea's testimony and the cross-examination of other witnesses, to suggest that Appellant had no motive to have shot Peirce and that Leanthony did. One might question the wisdom or efficacy of the strategy, but that is not a basis for saying that trial counsel's performance fell below an objective standard of representation.

{¶50} Accordingly, Appellant's second assignment of error is without merit.

{¶51} Appellant's third assignment of error states: "THE VERDICTS WERE NOT SUPPORTED BY SUFICIENT EVIDENCE."

{¶52} Appellant's fourth assignment of error states: "THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶53} We address these two assignments of error together.

{¶54} "'"[S]ufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" *State v. Thompkins*, 1997-Ohio-52, ¶ 23, quoting *Black's Law Dictionary* (6th Ed. 1990). The appellate court's standard of review for sufficiency of evidence is to determine, after viewing the evidence in a light

15

most favorable to the prosecution, whether a rational trier of fact could find the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶55} When evaluating the sufficiency of the evidence, we do not consider its credibility or effect in inducing belief. *State v. Richardson*, 2016-Ohio-8448, ¶ 13. Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law. *Id.* This naturally entails a review of the elements of the charged offense and a review of the State's evidence. *Id.*

{¶56} When evaluating the weight of the evidence, we review whether the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other indicated clearly that the party having the burden of proof was entitled to a verdict in its favor, if, on weighing the evidence in their minds, the greater amount of credible evidence sustained the issue which is to be established before them. "Weight is not a question of mathematics but depends on its effect in inducing belief." *Thompkins* at ¶ 24. Whereas sufficiency relates to the evidence's adequacy, weight of the evidence relates the evidence's persuasiveness. *State v. Jordan*, 2023-Ohio-3800, ¶ 15.

{¶57} The trier of fact is the sole judge of the weight of the evidence and the credibility of the witnesses. *State v. Landingham*, 2021-Ohio-4258, ¶ 22 (11th Dist.); *State v. Antill*, 176 Ohio St. 61, 67 (1964). The trier of fact may believe or disbelieve any witness in whole or in part, considering the demeanor of the witness and the manner in which a witness testifies, the interest, if any, in the outcome of the case, and the connection with the prosecution or the defendant. *Id.* This Court, engaging in the limited weighing of the

16

evidence introduced at trial, is deferential to the weight and factual findings made by the factfinder. *State v. Brown*, 2003-Ohio-7183, ¶ 52 (11th Dist.). The reviewing court "determines whether . . . the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App. 3d 172, 175 (1st Dist. 1983).

**{¶58}** A finding that a judgment is supported by the manifest weight of the evidence necessarily means the judgment is supported by sufficient evidence. *State v. Arcaro*, 2013-Ohio-1842, ¶ 32 (11th Dist.).

**{¶59}** R.C. 2903.11(A)(2) provides that no person shall knowingly "[c]ause or attempt to cause physical harm to another . . . by means of a deadly weapon . . . ." R.C. 2923.11(A) provides that a "'deadly weapon' means any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."

**{¶60}** The jury also found Appellant guilty on the three-year firearm specification as provided in R.C. 2941.145(A), which requires a finding that the "offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."

**{¶61}** Appellant argues that the State did not present sufficient evidence of his mens rea to commit the offense of felonious assault. R.C. 2901.22(B) provides in pertinent part: "[a] person acts knowingly, regardless of purpose, when the person is

17

aware that the person's conduct will probably cause a certain result or will probably be of a certain nature."

{¶62} The evidence was sufficient to establish that Appellant knowingly caused or attempted to cause serious physical harm to Pierce by means of a deadly weapon. The testimony, if believed, explicitly established that Appellant fired a 9-millimeter semi-automatic handgun at Pierce, striking him multiple times about the body. After Pierce fell to the ground, he said that Appellant stood over him and shot at him again. There is no question that there was sufficient evidence to establish that Appellant was aware that firing a gun at a person multiple times would probably result in serious injury. *See State v. Oliver*, 2009-Ohio-4928, ¶ 33 (11th Dist.) (The shooting of a gun in circumstances likely to cause injury supports the inference a defendant acted knowingly.)

{¶63} Appellant's conviction was also supported by the manifest weight of the evidence. We are mindful that we are a reviewing court, engaged in a limited weighing of the evidence introduced at trial. As such we give deference to the jury as the finder of fact and sole judge of the credibility of witnesses, only ordering a new trial where the jury has clearly lost its way.

{¶64} The credibility of witnesses was central to the determination of this case. Pierce testified that it was Appellant who shot him. Although he did not initially tell the police that it was Appellant, he did later identify him in a lineup. Leanthony's testimony supported Pierce's account and amplified it with Appellant's efforts to intimidate him into silence. Finally, Appellant was arrested with the same firearm that was used to shoot Pierce. While Tanea provided an alternative narrative that contradicted Pierce and Leanthony, the jury was free to believe or disbelieve that testimony in coming to its verdict.

18

Nothing in the record suggests that the jury clearly lost its way in finding Appellant guilty of Felonious Assault.

{¶65} Accordingly, Appellant's third and fourth assignments of error are without merit.

{¶66} Appellant's fifth assignment of error states: "THE STATE COMMITTED PROSECUTORIAL MISCONDUCT BY TESTIFYING DURING CROSS EXAMINATION."

{¶67} In his final assignment of error, Appellant argues that it was improper for the prosecutor to make remarks during cross-examination about the truth of certain statements that Tanea had made during her interview at the prosecutor's office. He says that the prosecutor's comments on these statements, indicating the prosecutor did not recall these remarks, was an attempt to discredit Tanea and prejudiced the jury by placing the prosecutor's personal credibility at issue against the credibility of Tanea.

{¶68} In a claim of prosecutorial misconduct, whether based on improper remarks or other conduct, we consider (1) whether the State's remarks or conduct were improper, and if so, (2) whether they prejudicially affected the appellant's substantial rights. *State v. Treesh*, 2001-Ohio-4, ¶ 22. The allegedly improper statements or conduct are evaluated in the context of the entire trial. *Id.* Improprieties do "not affect a substantial right of the accused if it is clear beyond a reasonable doubt that the jury would have found the defendant guilty even without" them. *Id.*

{¶69} It is inappropriate for a prosecutor to attempt to interrupt a testifying witness to interject statements of fact and thereby "essentially testify in place of the witness." *State v. LaMar*, 2002-Ohio-2128, ¶ 149. However, that is not what happened here. The prosecutor asked whether Tanea had ever told the police or prosecutors the same details

19

she was relating in her testimony at trial. The purpose of asking such a question would be to highlight to the jury that a witness' testimony may be contrived or fabricated. The questions the prosecutor asked were leading questions that went directly to whether Tanea had told this story when she came to the prosecutor's office. On cross-examination Tanea did not remember whether she told the prosecutor about Pierce, Leanthony, and Paris pulling guns on each other. She agreed that relating this information would have been important. The prosecutor's conduct was not improper.

{¶70} Accordingly, Appellant's fifth assignment of error is without merit.

{¶71} For the foregoing reasons, the judgment of the Trumbull County Court of Common Pleas is affirmed.


MATT LYNCH, J.,

EUGENE A. LUCCI, J.,

concur.

Case No. 2024-T-0043