[Cite as *State v. White*, 2026-Ohio-1692.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

| | |
|---|---|
| STATE OF OHIO, | CASE NOS. 2025-A-0019 |
| | 2025-A-0020 |
| Plaintiff-Appellee, | |
| | |
| - vs - | Criminal Appeals from the |
| | Court of Common Pleas |
| LAURA REGINA WHITE, | |
| | |
| Defendant-Appellant. | Trial Court Nos. 2023 CR 00629 |
| | 2023 CR 00316 |

## OPINION AND JUDGMENT ENTRY

Decided: May 11, 2026
Judgment: Affirmed

*April R. Grabman*, Ashtabula County Prosecutor, and *Dane R. Hixon*, Assistant Prosecutor, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Richard E. Hackerd*, 55 Public Square, Suite 2100, Cleveland, OH 44113 (For Defendant-Appellant).

ROBERT J. PATTON, J.

{¶1} Defendant-appellant, Laura Regina White ("White"), appeals from two judgments of the Ashtabula County Court of Common Pleas convicting her of murder with a firearm specification, tampering with evidence, and gross abuse of a corpse in Case No. 2023 CR 00316, and felonious assault in Case No. 2023 CR 00629. White was sentenced to 22 years to life in prison. For the following reasons, we affirm.

{¶2} This appeal involves two underlying cases which have been consolidated by the court. On appeal, White's assignments of error relate to her convictions in Case No. 2023 CR 00316. White asserts that the trial court erred or otherwise abused its

discretion when it admitted several pieces of evidence at trial. Specifically, White asserts that several pieces of evidence constituted impermissible "other acts" evidence pursuant to Evid.R. 404(B).

{¶3} Upon review of the evidence, we conclude that the trial court did not err or otherwise abuse its discretion when it admitted the various pieces of evidence. Specifically, we conclude that Officer Mark Allen's ("Officer Allen") testimony about an arrest warrant did not constitute "other acts" evidence as the testimony did not mention White or any other details surrounding the warrant. Officer Timothy Bruckman's ("Officer Bruckman") testimony about White's jailhouse statements were also not "other acts" evidence. The fact that the statement occurred while incarcerated does not render the statement an "other act" that would be prohibited by the evidentiary rules.

{¶4} City of Ashtabula Police Detective-Lieutenant Michael Palinkas's ("Lieutenant Palinkas") testimony regarding White's statements about her drug use, the sexual relationship between her and the murder victim, and the prior shooting involving the victim, constituted "other acts" evidence. However, the statements were offered for non-propensity purposes and were not unduly prejudicial to White. Therefore, they were properly admitted as evidence.

{¶5} White also asserts that the trial court erred when it admitted photographs and testimony of a noose that was collected at the crime scene. Lieutenant Palinkas testified that the rope was initially collected during a search of the residence due to suspected blood evidence on the rope. At trial, defense counsel elicited testimony about White's suicidal ideations on cross-examination. Any error in the admission of the noose, as it related to White's alleged suicidal ideations, was invited error.

{¶6} Finally, White contends that the trial court erred when it permitted Lieutenant Palinkas to testify about the contents of the journal. Specifically, White asserts that the contents amounted to impermissible "other acts" evidence. White also alleges in her second assignment of error, that the State failed to lay a proper foundation, or establish ownership, prior to introducing the journal. Upon review, the entries in the journal do not constitute "other acts" evidence pursuant to Evid.R.404(B). The entries were offered to establish motive for the murder and were not unduly prejudicial to White. Furthermore, the contents of the journal were sufficient to support a finding that the journal in question is what the State claims, to-wit: White's journal. The trial court did not abuse its discretion when it admitted the journal at trial.

{¶7} As none of White's assignments of error are meritorious, the judgments of the Ashtabula County Court of Common Pleas are affirmed.

**Substantive and Procedural Facts**

{¶8} As noted above, this appeal involves two underlying cases which have been consolidated by the court. White's assignments of error stem solely from the trial court's decisions and the jury trial in Case No. 2023 CR 316. Thus, this opinion contains only a short recitation of the procedural facts in Case No. 2023 CR 629.

*Case No. 2023 CR 316*

{¶9} On June 30, 2023, the Ashtabula County Grand Jury issued a five-count indictment charging White with Aggravated Murder, an unclassified felony, in violation of R.C. 2903.01(A) and 2929.02(A) with an accompanying firearm specification pursuant to R.C. 2941.145(A) ("Count 1"); Tampering with Evidence, a third-degree felony, in violation of R.C. 2921.12(A)(1) and 2921.12(B) ("Count 2"); Gross Abuse of a Corpse, a fifth-

degree felony, in violation of R.C. 2927.01(B) and (C) ("Count 3"); Murder, an unclassified felony, in violation of R.C. 2903.02(B) and (D) and 2929.02(B) with an accompanying firearm specification pursuant to R.C. 2945.145(A) ("Count 4"); and Felonious Assault, a second-degree felony, in violation of R.C. 2903.11(A)(2) and (D)(1)(a) with an accompanying firearm specification pursuant to R.C. 2941.145(A) ("Count 5").[1]

{¶10} On July 14, 2023, White entered a plea of not guilty by reason of insanity and requested a competency evaluation pursuant to R.C. 2945.371.[2] The trial court granted the motions and ordered White to be evaluated to determine her sanity and her competency to stand trial.

{¶11} A competency hearing was held on October 18, 2023. Both parties stipulated to the admissibility and the findings of the report by Dr. Thomas Gazely. The trial court concluded that White was not competent to stand trial based upon Dr. Gazely's report and ordered White to undergo treatment at Northcoast Behavioral Health for restoration of competency. The parties reconvened for a second competency hearing on March 11, 2024. The trial court found White competent to stand trial.

{¶12} On March 20, 2024, the trial court ordered an evaluation to determine White's sanity. A sanity hearing was held on June 12, 2024. Defense counsel sought a second sanity evaluation which the trial court granted on June 13, 2024. A second sanity hearing was held on September 4, 2024. The parties stipulated to the admissibility and

---

1. The case was initially filed in the Ashtabula Municipal Court in Case No. 2023 CRA 483. Bond was set at $1,000,000 cash or surety. The case was dismissed upon State's motion after the Ashtabula County Grand Jury indicted White.
2. An initial forensic report was prepared on June 6, 2023, prior to the indictment by the Ashtabula County Grand Jury. The municipal court granted defense counsel's request for a second opinion in the municipal court.

Case Nos. 2025-A-0019, 2025-A-0020

the findings of the second report by Dr. Lynn Luna Jones. The trial court found White was sane at the time of the offense and was competent to stand trial.

{¶13} Prior to trial, defense counsel filed a series of motions in limine. On January 23, 2025, defense counsel filed five such motions. Specifically, White sought to prohibit the State from introducing statements or testimony by Brittany Fitzer ("Brittany"), Vernon Hall ("Hall"), and Julie Rose ("Rose") that the victim, ("C.F."), was previously shot by White or statements expressing their personal belief that White was responsible for harming C.F. White also sought to prohibit the State from introducing testimony of Lieutenant Palinkas regarding the same alleged prior shooting incident between White and C.F. Defense counsel sought to limit or exclude any testimony or evidence regarding additional weapons in White's home pursuant to Evid.R. 404(B). Additionally, White sought to exclude any testimony regarding DNA evidence of anyone other than C.F. and White. White further sought to exclude any evidence or testimony regarding unrelated bullet holes at the residence, located at 1813 Harbor Avenue, and any testimony regarding a prior incident in 2020 between White and her son, Samuel Marshall at the Harbor Avenue residence.

{¶14} On January 24, 2025, White filed a sixth and seventh motion in limine seeking to prohibit the State from introducing any evidence that White was a methamphetamine user and to prohibit the State from introducing a journal purportedly authored by White as evidence.

{¶15} On January 27, 2025, the trial court held a hearing on White's seven motions in limine. The trial court determined that Brittany, Rose, and Hall would not be permitted to testify as to any speculation. However, testimony would be permitted

Case Nos. 2025-A-0019, 2025-A-0020

regarding Hall's observation of C.F. picking buckshot out of his foot and that C.F. was shot in a separate incident. As to additional DNA evidence found at the scene belonging to Rose, the State indicated at the hearing that it did not intend to offer that evidence at trial. In regard to the bullet holes found at the residence, the State again indicated that it did not intend to introduce the bullet holes that were unrelated to the underlying offenses, but intended to introduce the bullet hole that was discovered under the rolled-up carpet. The trial court also indicated that it would allow pictures of the crime scene which included photographs of an ax and a noose. The noose was also collected as evidence and deemed admissible. The trial court concluded that White's statement that she used methamphetamine was admissible. Finally, the trial court stated that the journal was also admissible.

{¶16} On February 20, 2025, White filed her eighth and ninth motions in limine. Both motions were addressed on the day of trial, prior to opening statements. In her eighth motion, White sought to prohibit the State from introducing photographs of White with the alleged firearm taken approximately a year and half prior to the murder, in November 2021. The trial court granted this motion but indicated that the State may be permitted to use the photographs in the cross-examination of White. In her ninth motion in limine, White sought to prohibit the State from introducing statements that White threatened to burn down Rose's house and commit other violent acts. The State acknowledged that Rose was instructed not to discuss the February 2023 incident. Defense counsel renewed the motions in limine previously addressed by the trial court regarding the additional weapons at the scene and White's methamphetamine use. The trial court granted

defense counsel's motion regarding White's methamphetamine use but denied the remaining requests.

{¶17} The case proceeded to a three-day jury trial on February 26, 2024. The following testimony was presented at trial:

{¶18} In April 2023, C.F. was living with his cousin, White, at her home located at 1813 Harbor Avenue in Ashtabula County, Ohio. C.F. and White had been living together for approximately two years. According to C.F.'s daughter, Brittany, C.F. was planning to move out of White's home and had started to remove his tools and clothes from the Harbor Avenue residence.

{¶19} At approximately 9:00 a.m., on April 4, 2023, Hall and Rose went to the Harbor Avenue residence to pick C.F. up for work. At that time, Hall and C.F. were working together at Budget Auto. After work, at approximately 5:00 p.m., Hall dropped C.F. off at the Harbor Avenue residence. According to Hall, C.F. had asked to come over to Hall's house to shower and eat. Hall told C.F. that he could come over. According to Hall, C.F. did not call or come over that evening.

{¶20} The following day, on April 5, 2023, at approximately 8:00 a.m., Hall and Rose returned to the Harbor Avenue residence to pick C.F. up for work. Hall testified that he knocked on the door but there was no answer. Hall and Rose left and went to work. Hall returned to the residence the following day. According to Hall, White answered the door and told him that C.F. left the residence with a Puerto Rican female identified as "Yahya." Hall testified that he spoke to Yahya, who told him that C.F. was not with her. After not hearing from C.F., Hall called C.F.'s daughter, Brittany.

{¶21} When Brittany was unable to reach C.F. by phone, she also went the Harbor Avenue residence. White spoke to Brittany from an upstairs window and did not invite Brittany inside. White told Brittany her father had left with a female in a green car. Brittany testified that after not being able to reach or locate her father, she checked local hospitals, pharmacies, and the jail to see if C.F. was there. According to Brittany, she continued to go back to the Harbor Avenue residence looking for C.F. Brittany called the police on April 7, 2026.

{¶22} Ashtabula City Police Officer, Mark. L. Allen ("Officer Allen") was dispatched to the Harbor Avenue residence to conduct a welfare check on C.F. Allen was unable to make contact with anyone at the residence. Officer Allen returned the following day and met Brittany and Hall. According to Officer Allen, Brittany was very concerned about C.F. because she had not heard from him in several days, which was unusual. Brittany also indicated that C.F. had medical conditions. Again, Officer Allen was unable to make contact with anyone at the Harbor Avenue residence, including White.

{¶23} Officer Allen testified that he entered C.F. into the Law Enforcement Automated Data System ("LEADS") as a missing and endangered person due to the reported medical issues. Officer Allen continued to patrol the area around the Harbor Avenue residence. While patrolling the area, Officer Allen observed White walking North on Harbor Avenue and approached her. Officer Allen testified that he explained the concerns about C.F. to White and that White told him that she had not seen C.F. in a couple of days. White reported that C.F. left with a Hispanic female in a small car.

{¶24} Officer Allen testified he went to the Harbor Avenue residence. Officer Allen described the residence as "cold inside" and "a bit disheveled." According to Officer Allen,

Case Nos. 2025-A-0019, 2025-A-0020

there was also fresh paint. White told Officer Allen she had been doing some remodeling and painting.

{¶25} On April 8, 2023, Officer Allen and Lieutenant Defina searched the Harbor Avenue residence but did not locate C.F. Officer Allen indicated that at that time, law enforcement was looking for a missing person and not a body or other forensic evidence.

{¶26} Lieutenant Palinkas was dispatched to the Harbor Avenue residence on April 11, 2023, to assist with a missing persons investigation. Lieutenant Palinkas testified that he spoke with White at the residence and that she allowed officers to look around the house. Palinkas described the house as "very disorganized and disheveled." Lieutenant Palinkas did not recall any odor or smells in the home during this visit. White reported to officers that C.F. came home from work on April 4, 2023, and left that evening with a Hispanic female in a green sedan. White also reported that she had a 12-gauge shot gun and a .410/.45 caliber handgun that was missing. White also indicated that she used methamphetamine daily.

{¶27} During the search, law enforcement officers had some concerns because there was a dense patch of woods behind the house which led to the Ashtabula River. A cadaver dog was called to the scene. According to Lieutenant Palinkas, the dog alerted to the back yard but did not identify a source.

{¶28} Lieutenant Palinkas testified that during the course of the investigation, officers also spoke with Rose, who had previously resided with C.F. and White at the Harbor Avenue residence. According to Lieutenant Palinkas, Rose had moved out several months before C.F. was reported missing.

Case Nos. 2025-A-0019, 2025-A-0020

{¶29} On April 14, 2023, Lieutenant Palinkas interviewed White. Lieutenant Palinkas read White her Miranda rights and White signed a waiver of rights form. During the interview, White informed officers of a prior incident involving a handgun that was accidentally discharged at the Harbor Avenue residence about six months prior to the interview. White told Lieutenant Palinkas that she did not believe that C.F.'s foot was injured during that incident. White also indicated that she and C.F. previously had a sexual relationship that lasted for about six to seven months. According to Lieutenant Palinkas, White used the past tense when referring to C.F. during the interview. After the interview, law enforcement obtained a search warrant to search the Harbor Avenue residence and requested the Ohio Bureau of Criminal Investigation ("BCI") to assist in that process.

{¶30} BCI Special Agent Daniel Boerner ("Agent Boerner") was dispatched to the Harbor Avenue residence to assist in processing the residence. Agent Boerner testified that prior to going to the residence, he met with Lieutenant Palinkas at the police department to wait for the search warrant. Upon arriving at the residence, Agent Boerner photographed the exterior of the residence. Agent Boerner testified that law enforcement cleared the house and then entered the side door to conduct the search. Photographs were taken of the rooms as they were first observed. In a first-floor bedroom, Agent Boerner testified regarding the discovery of a white towel and a pair of jeans with suspected blood stains on them. Also, in the first-floor bedroom was a shopping bag with four unfired .45 caliber cartridges inside. In the area between the kitchen and living area, a .410 "shot shell" was recovered from a green bag. Three more .410 "shot shells" were recovered from the living room. A .45 caliber cartridge was recovered from a dresser inside the first-floor bedroom. A suspected blood stain was discovered on the side of a

bathtub. A green composition notebook was recovered from the upstairs bedroom. A suspected blood stain was also discovered on the carpet underneath another carpet.

{¶31} Chief Robert D. Stell ("Chief Stell") of the City of Ashtabula Police Department briefly assisted officers and investigators with a search of the Harbor Avenue residence. Chief Stell located some shotgun shells in a dresser drawer and a journal that was in a bag or purse. The items were collected by other officers. Chief Stell testified that after locating the items in the bedroom, he went to the rear of the house that included an addition. Outside of the home, Chief Stell observed vent windows on the back of the addition or rear of the house. Using a flashlight, Chief Stell could see a pile of clothing. Chief Stell testified that it appeared unusual because the clothing was very clean for being in a crawl space. When looking through the vent, Chief Stell observed "light peeking through an area from the other side of the crawl space" which looked like an old basement window.

{¶32} Chief Stell returned inside the residence and went to the basement. Chief Stell testified that he did not observe any odors when he entered the basement. He discovered the area he could see from the vents outside. He testified that it was no longer a window, "there was boards or slats and yellow spray foam insulation in between the cracks of those boards." Chief Stell testified he removed the spray foam to be able to look inside of the crawl space. Initially, Chief Stell saw the clothing, and noticed the area was "very clean looking." Chief Stell testified that after observing the area, he saw what he thought to be the left knee of a person. Chief Stell testified that he informed investigators of the discovery. C.F.'s body was ultimately discovered under the floorboards and under a pile of clothing, in a crawl space of the 1813 Harbor Avenue residence.

Case Nos. 2025-A-0019, 2025-A-0020

{¶33} Lieutenant Palinkas testified that he was alerted that the body was found and proceeded to go to the basement where the discovery was made. He noted a faint smell of decomposition after the foam insulation had been peeled away from the opening. After the body was discovered, Agent Boerner testified that officers moved a dresser in the bedroom looking to access the crawl space. Under the dresser there were several pieces of plywood covering up the original flooring. Once those pieces were removed, officers discovered an area of the floor that appeared cut. When the officers removed the cut pieces of flooring, they were able to access the crawl space.

{¶34} Inside of the crawl space, officers observed a pile of clothing with a rake on top and some fishing poles were also observed in the area. As more of the loose items were moved, C.F.'s body could be seen through the opening in the floor. C.F. was found lying back on his knees. The fire department was called to assist in the removal of some of the flooring so that law enforcement officials could access the body and continue to process the scene.

{¶35} On April 14, 2023, Officer Bruckman was assigned to the jail and district 2. According to Officer Bruckman, he worked from 7:00 a.m. to 7:00 p.m. Officer Bruckman described the jail to have three isolation cells, cell 133, 134, and 135, which are attached to one another by a common wall. Officer Bruckman testified that two inmates were in isolation cells on April 14, 2023, White and a male, identified as Inmate Jones. According to Officer Bruckman, Inmate Jones was yelling toward White, and the pair were bantering back and forth. Officer Bruckman testified that he heard Inmate Jones ask White if she used a knife. White responded "no, with a shotgun." The conversation was not captured on the officer's body worn camera.

Case Nos. 2025-A-0019, 2025-A-0020

{¶36} The autopsy was performed by Dr. Dan Galita on April 15, 2023. Dr. David Dolinak ("Dr. Dolinak"), the deputy medical examiner at the Cuyahoga County Medical Examiner Department testified as a substitute witness.[3] Dr. Dolinak testified that C.F.'s body was "moderately decomposed" and "there were injuries that were seen just by looking at him." Rigor mortis was no longer present. Dr. Dolinak testified that rigor mortis generally dissipates three days or so after death. C.F.'s body was discovered 10 days after he was last seen on April 4, 2023. Dr. Dolinak indicated that the level of decomposition was consistent with death occurring 10 days prior.

{¶37} Dr. Dolinak testified that five injuries were discovered on C.F.'s body: two gunshot wounds and three shotgun wounds. Two bullets were recovered from the body from the two gunshot wounds and "a lot of small spherical lead pellets called birdshots" were also recovered from the body. Changes to the skin, called fouling and stippling were present around the neck wound which indicated that the gun was close to the skin when it was fired. Dr. Dolinak estimated that based on the marks in the skin, the end of the gun was "somewhere from a few inches to a foot or so" from the skin when it was fired.

{¶38} Dr. Dolinak testified that one bullet went into the back of his neck, through his spine, through the fourth and fifth cervical vertebrae, transecting the spinal cord. This bullet was recovered from the front of C.F.'s neck. While some pellets remained in the body, many exited leaving a large gaping wound on the left side of C.F.'s neck. All of these shots entered the back of the body, travelled back to front, right to left, and slightly downward. According to Dr. Dolinak, the close grouping of these wounds was consistent with wounds happening in rapid succession.

---

3. Dr. Galita retired prior to trial.

Case Nos. 2025-A-0019, 2025-A-0020

{¶39} There was another gunshot wound in C.F.'s back. The bullet travelled through the back, fractured two ribs, went through a lung and the heart, through the vena cava (the large vein near the heart), and was found lodged under the skin on the left side of C.F.'s chest. This shot entered the back of the body, travelled back to front, right to left, and upwards. There was no stippling or fouling around the entrance wound.

{¶40} Dr. Dolinak testified that each of the wounds could be fatal and opined that C.F. would have survived only minutes after sustaining the injuries. The cause of death was "shotgun and gunshot wounds of the neck and right back, with skeletal, visceral and soft tissue injuries." Dr. Dolinak agreed that the manner of death was homicide. Dr. Dolinak noted that there was a presence of drugs in C.F.'s system, but that the drugs did not cause his death.

{¶41} Dr. Dolinak testified that the odor of decomposition does not happen immediately because it takes time for the gases to form and emit. Dr. Dolinak also explained that a colder environment could delay decomposition.

{¶42} BCI Crime scene technician, Michael Rostocil, was dispatched to the Harbor Avenue residence to conduct an additional search of the premises for blood stain evidence on April 18, 2023. Specifically, Rostocil noted that the floors in the residence had been painted and that items appeared to be painted around. Rostocil collected a blood sample located behind the first-floor bedroom door. Rostocil described spray foam at the base of the wall behind the door. Additional suspected blood stains were discovered on the doorframe of the door. Evidence collected was turned over to detectives.

{¶43} Detective Wesley Burns testified that he collected DNA from White pursuant to a search warrant on April 19, 2023.

Case Nos. 2025-A-0019, 2025-A-0020

{¶44} BCI forensic scientist in the firearms division, Michael Roberts ("Roberts"), examined unfired shot shells, a .410 gauge, as well as two fired bullets that were submitted by the Ashtabula Police Department. Roberts testified that he examined each of the fired bullets for caliber and then compared them to each other to see if he could see a reproducible pattern that is imparted on the bullet as it travels through the barrel of the firearm using a comparison microscope. The two fired bullets were identified as .45 caliber lead bullets consistent with being a Colt .45 caliber/type bullet with six lands and grooves with a right-handed twist. Roberts was unable to identify a matching pattern because there was insufficient detail for identification or elimination purposes. Additionally, because no firearm was submitted to test, the collected bullets were unable to be matched to a specific weapon. However, Roberts testified that the "Public Defender" Colt .410/.45 revolver owned by White could fire the caliber of the bullets tested by Roberts.

{¶45} Roberts testified that he is familiar with Taurus, a manufacturer of firearms. Taurus makes a model known as "The Judge." According to Roberts, the firearm fires both a .410 shotgun shell and .45 Colt bullet cartridges. It typically holds five rounds of either .410 shotgun shells or .45 bullets. Roberts also testified that cartridge cases remain inside the revolver until manually removed. Roberts indicated that there are several other guns that could also fire both types of ammunition, including Taurus's "Public Defender".

{¶46} BCI forensic scientist in the DNA unit, Marissa Keely ("Keely"), testified that she received 17 different items on April 5, 2023. Keely also received additional pieces of evidence from Detective Wayne Howell on October 29, 2024, and January 29, 2025. Keely testified that White's DNA was not found on any interpretable profiles submitted.

{¶47} At the close of the second day of trial, the State made an oral motion to reopen the case and sought to call an additional witness or in the alternative to recall Lieutenant Palinkas to discuss the contents of the journal, State's Exhibit 49. Defense counsel objected. The court granted the State's motion to recall Lieutenant Palinkas for the sole purpose of talking about the contents of the journal. Defense counsel renewed their motion in limine. The trial court denied the motion and admitted the journal into evidence.

{¶48} Upon being recalled, Lieutenant Palinkas testified that a composition notebook containing a journal was seized from a second-floor bedroom at the Harbor Avenue residence during the search of the residence on April 14, 2023. The journal was written in the first person and, at times, the author identified themselves as White. Some of the entries were dated. The journal references C.F. "multiple times." One entry contained the following statement "I have so much hate in my heart for [C.F.] how can my heart be pure It can not be pure with the hate I hold for the thing [C.F.] is doing to me." In another entry, "[C.F.] came back to the house [and] I'm asking, why god? I'm damb [sic] if I do, damb [sic] if I don't I do not understand what I'm supposed to do. He is always making me feel like I'm nothing. He's always talking [and] having sex in front of me while he's in the house."

{¶49} In another entry dated April 27, 2022, contained the following statements "I believe in You, most high Jesus. I make decisions base[d] on how [C.F] has treated me. I do love him yet I also believe he would not give me as many look-overs as I have to he. All of this deceit an[d] sabotage towards me is hard to accept."

{¶50} In another entry, dated February 9, 2023: "I am so tired [and] still trying to maintain. I truly want to kick some ass - yet I'm too old for this shit. If they keep trying me I will give them these hands. . .Please keep these fools away from me. I have had enough. If you do not think so, you will have them try me [and] I'm going to take names. It's all going to be epic."

{¶51} At the close of the State's case, defense counsel made an oral motion for acquittal pursuant to Crim.R. 29. The trial court denied the motion. The motion was renewed after the defense rested and was again denied.

{¶52} On February 27, 2025, the jury found White not guilty of aggravated murder as charge in Count 1 of the indictment. The jury found White guilty of murder, the lesser included offense of aggravated murder and made the affirmative finding on the accompanying firearm specification. The jury also found White guilty of Counts 2, 3, 4, and 5, as charged in the indictment, and made the affirmative finding as to the firearm specifications which accompanied Counts 4 and 5. Bond was revoked.

*Case No. 2023 CR 629*

{¶53} On December 21, 2023, the Ashtabula County Grand Jury, in a two-count indictment, charged White with Felonious Assault, a felony of second degree, in violation of R.C. 2903.11(A) and (D)(1)(a) ("Count 1") and Kidnapping, a first degree felony, in violation of R.C. 2905.01(A)(3) and (C)(1) ("Count 2"). On March 11, 2024, White appeared at arraignment and entered a plea of not guilty.

{¶54} On April 11, 2024, White filed a plea of not guilty by reason of insanity and requested an evaluation pursuant to R.C. 2945.271. On April 12, 2024, the trial court ordered a competency evaluation to determine White's sanity to stand trial.

Case Nos. 2025-A-0019, 2025-A-0020

{¶55} A competency hearing was held on June 12, 2024. White refused to stipulate to the report of Dr. Jessica Hart, Ph.D., and requested a second opinion. The trial court granted White's request for a second opinion on June 13, 2024. On June 14, 2024, the trial court also ordered an examination of White to determine her sanity at the time of the alleged offense. A second hearing was held on September 4, 2024. The parties stipulated to the second opinion, and the trial court found White to be sane and competent to stand trial.

{¶56} On March 10, 2025, White appeared with counsel and entered a guilty plea to Count 1, Felonious Assault, a felony of the second degree, in violation of R.C. 2903.11(A)(D)(1)(a), pursuant to *North Carolina v. Alford*, 400 US 25 (1970). The remaining count, Count 2, was dismissed in accordance with the negotiated plea. The parties jointly recommended an indefinite sentence of four to six years. No pre-sentence investigation was ordered.

{¶57} The State offered the following factual basis:

> Your Honor, on April 11, 2023, while Ashtabula Police Department was investigating a missing person that later became the victim of a homicide, came across Julie Rose. Julie disclosed that she also used to reside at 1813 Harbor Avenue with [C.F.] and [White], and during that time, she was physically assaulted by [White]. She said she was strangled to the point of losing consciousness and beaten repeatedly.
> She said she moved in with [White] with her boyfriend, David Bradbury. When David was taken to jail in mid-February, she continued to stay at the house. She confronted [White] about taking some of her belongings., and [White] wrapped a cable around her neck and strangled her. She hit her with a handgun, cut her with a razor, and repeatedly choked her.
> Blood found at the scene during the murder investigation revealed Julie's DNA. Julie forwarded five photos of her injuries to the detectives, and detectives were

Case Nos. 2025-A-0019, 2025-A-0020

able to confirm with another male that he walked in on [White] beating a female."

{¶58} The trial court accepted White's plea and set the matter for sentencing.

*Sentencing in 2023 CR 316 and 2023 CR 369*

{¶59} A sentencing hearing was held in both underlying cases on April 3, 2025. The parties stipulated that White had 721 days of jail-time credit.

{¶60} In Case No. 2023 CR 316, the State agreed that Counts 4 and 5 would merge with Count 1 for purposes of sentencing and elected to proceed on Count 1. The trial court made the consecutive findings and imposed the following sentence. On Count 1: Murder, as the lesser included offense of aggravated murder, the trial court sentenced White to 15 years to life in prison. The trial court also imposed 3 years on the accompanying firearms specification, which was ordered to be served consecutively to and prior to the underlying offense. On Count 2, Tampering with Evidence, the trial court imposed a sentence of 36 months in prison and ordered the sentence to be served consecutively to the sentence imposed on Count 1. On Count 3, Gross Abuse of a Corpse the trial court imposed a sentence of 12 months in prison and ordered it to be served consecutively to the sentences imposed on Counts 1 and 2 for an aggregate sentence of 22 years to life in prison.

{¶61} In Case 2025 CR 629, the trial court imposed the jointly recommended sentence of an indefinite term of imprisonment of four to six years. That sentence was ordered to be served concurrently to the sentence imposed in Case No. 2023 CR 316.

{¶62} White appeals from the trial court's sentencing entries.

Case Nos. 2025-A-0019, 2025-A-0020

**The Appeal**

{¶63} White raises two assignments of error for review:

"[1.] The Trial Court committed reversible error in admitting evidence of prior bad acts."

"[2.] The Court abused its discretion when it admitted testimony about a journal found at the murder-home. T.p. @ 617."

{¶64} In her first assignment of error, White asserts that the trial court erred in admitting several pieces of evidence. Specifically, she claims that the evidence consisted of inadmissible prior bad acts or "other acts".

{¶65} In general, the determination to admit or exclude evidence lies within the discretion of the trial court and will not be reversed absent an abuse of discretion. *State v. Miller*, 2015-Ohio-956, ¶ 14 (11th Dist.). All relevant evidence is admissible and evidence which is not relevant is not admissible. Evid.R. 402. There are several exceptions to the principle that all relevant evidence is admissible. Evid. R. 403 provides: "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 404(B) provides an additional exception: "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Evid.R. 404(B)(1). Such evidence may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Evid.R. 404(B)(2).

{¶66} A more extensive list of exceptions is codified in R.C. 2945.59 which provides:

Case Nos. 2025-A-0019, 2025-A-0020

In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

{¶67} White identifies seven pieces of evidence that she claims were erroneously admitted at trial. We address each separately.

*Officer Allen's Testimony regarding White's Arrest Warrant*

{¶68} White first asserts that the trial court erred in denying her motion for a mistrial after Officer Allen testified to an arrest warrant for White's arrest on unrelated charges. White asserts that such testimony consisted of inadmissible "other acts" evidence.

{¶69} "The admission of such [other-acts] evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that created material prejudice." *State v. Diar*, 2008-Ohio-6266, ¶ 66; *State v. Morris,* 2012-Ohio-2407, ¶ 14. Similarly, we review a motion for mistrial for an abuse of discretion. *State v. O'Neil*, 2024-Ohio-512, ¶ 48 (11th Dist.). An abuse of discretion is the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'" *State v. Beechler*, 2010-Ohio-1900, ¶ 62 (2d Dist.), quoting *Black's Law Dictionary* (8th Ed. 2004).

{¶70} White directs this court to the following testimony at trial:

[STATE]: Did you have another interaction with [White] a few days later?

Case Nos. 2025-A-0019, 2025-A-0020

[OFFICER ALLEN]: I did.

[STATE]: And what was that in relation to?

[OFFICER ALLEN]: Um, I had become aware and Lieutenant Defina became aware that there was a warrant for - -

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained.

{¶71} White alleges that "[t]he fact of the warrant alerted the jury to the other criminal conduct of the accused and poisoned the jury pool denying [White] a fair trial." We disagree. The witness did not identify who the warrant was for or what the surrounding facts were regarding the warrant. Defense counsel objected and prevented the witness from disclosing the alleged, inadmissible other-acts evidence. The witness did not testify to a prior bad act or other act. See *State v. Gonzalez*, 2008-Ohio-2749, ¶ 48 (7th Dist.). Thus, the trial court did not abuse its discretion in denying White's motion for a mistrial on these grounds.

{¶72} White further asserts that the trial court erred by failing to give a curative instruction after it sustained the defense counsel's objection. However, defense counsel did not request a curative instruction. "In general, where a party fails to follow up its objection with a request for a curative instruction, that party waives its right to assert the error on appeal." *State v. Shine-Johnson*, 2018-Ohio-3347, ¶ 98 (10th Dist.) citing *State v. Alexander*, 2007-Ohio-4177, ¶ 36 (10th Dist.). White has forfeited this issue for review; thus, we will not address it for the first time on appeal. *Id.*

*Officer Bruckman's Testimony Regarding White's Jailhouse Statement*

{¶73} White also alleges in her first assignment of error that the trial court erred in admitting testimony by Officer Bruckman regarding her statement to another inmate

wherein she told the inmate she killed someone with a shotgun. It is unclear from the briefing whether the premise of the claim is that White was incarcerated at the time she made the statement or the contents of the statement itself.

{¶74} Officer Bruckman made the following statement on direct examination.

> Inmate Jones, the male inmate in that same section, um, was yelling towards Inmate White, and they were going back and forth, bantering back and forth. Then it caught my attention, I heard him say, um, you killed somebody. Um, how did you kill him? With a knife? And she says, after numerous times of asking her, she says, no, with a -- a shotgun.

{¶75} At the time of the testimony, defense counsel did not object.

{¶76} "Other acts" evidence, by definition, is "evidence of other crimes, wrongs, or acts." As noted above, while Officer Bruckman's testimony certainly conveys that White was incarcerated at the time she made the statement, the testimony contains no indication or suggestions that her incarceration was for an unrelated crime, wrong, or act. Moreover, the contents of White's statement itself do not include any details regarding another crime, wrong or act. Presumably, the statement relates to the underlying murder charge. Because there is no indication in the testimony that White was incarcerated for a prior or other bad act, the testimony does not amount to inadmissible other-acts evidence.

{¶77} As such, the trial court did not err or abuse its discretion when it permitted the testimony of Officer Bruckman regarding White's statement to another inmate.

*Lieutenant Palinkas's testimony regarding White's methamphetamine use*

{¶78} White next contends that the trial court erred when it admitted testimony of Lieutenant Palinkas regarding White's admission of illegal drug use.

{¶79} When determining whether evidence of other crimes, wrongs or acts of an accused may be admissible, courts use a three-step analysis. *State v. Williams*, 2012-Ohio-5695, ¶ 19.

> The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. *See* Evid.R 403.

*Williams* at ¶ 20. *See State v. Isom*, 2025-Ohio-604, ¶ 33 (11th Dist.).

{¶80} In *State v. Hartman*, 2020-Ohio-4440, the Supreme Court of Ohio explained that courts must determine how "other-acts" evidence connects to a proper non-propensity purpose without relying on any intermediate improper-character inferences to properly apply Evid.R. 404(B). *Hartman* at ¶ 23. Once the proponent of the evidence establishes a permissible non-propensity purpose, the trial court must consider the evidence under Evid.R. 403(A) and determine if the probative value of that evidence "'is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.'" *Hartman* at ¶ 29, quoting Evid.R. 403(A). *See State v. Echols*, 2024-Ohio-5088.

{¶81} Without question, White's admission to daily use of methamphetamine, an illegal drug, is a prior "other act", which may be excluded under Evid.R. 404(B). "The first step is to consider whether the other acts evidence is relevant to making any fact that is

of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401." *Williams* at ¶ 20.

{¶82} Prior to trial, the trial court conducted a hearing on the defense's motion in limine regarding White's admission to drug use. The State indicated that White admitted to using drugs, and that C.F. also had drugs in his system. Presumably, it was the State's position, based on White's statements to Lieutenant Palinkas that White and C.F. would use drugs together. Toxicology reports confirmed that C.F. had methamphetamine in his system at the time of death. It appears then that the State attempted to use the "other acts" evidence for a permissible purpose, identity and/or opportunity. Arguably, given the White's admission of the methamphetamine usage, C.F.'s toxicology report showing he had drugs in his system at the time of his death, and the location of C.F.'s body, make the identity of C.F.'s shooter more probable. Thus, the testimony was relevant for a non-propensity purpose.

{¶83} "The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)." *Williams,* 2012-Ohio-5695, at ¶ 20. As noted above, it appears the State offered the evidence for a non-propensity purpose, identity and/or opportunity.

{¶84} The final "step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. *See* Evid.R 403." *Williams* at ¶ 20. *See State v. Isom*, 2025-Ohio-604, ¶ 33 (11th Dist.).

{¶85}   As noted above, the inquiry does not stop after a non-propensity purpose is identified. The trial court must consider the evidence under Evid.R. 403(A) and determine if the probative value of that evidence "is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." The testimony regarding White's drug use was limited to admission of daily drug use. Upon review of the record, we cannot determine that the evidence was overly prejudicial. The evidence was relevant to facts in dispute, to wit: the identity of the shooter. As such, the trial court did not abuse its discretion in permitting this limited testimony.

{¶86}   Assuming arguendo that such admission was error, such error was harmless. As this court noted in *State v. Zachery*, 2021-Ohio-2176, ¶ 35 (11th Dist.), an "appellate court 'must consider both the impact of the offending evidence on the verdict and the strength of the remaining evidence after the tainted evidence is removed from the record.'" *Id*., quoting *State v. Morris*, 2014-Ohio-5052, syllabus. Indeed, "'the real issue when Evid.R. 404(B) evidence is improperly admitted at trial is whether a defendant has suffered any prejudice as a result. If not, the error may be disregarded as harmless error.'" *Zachery quoting Morris* at ¶ 25. The improper admission of evidence is harmless "if 'the remaining evidence alone comprises "overwhelming" proof of defendant's guilt.'" (Citation omitted.) *Zachery* citing *State v. Barker*, 2014-Ohio-4131, ¶ 94 (11th Dist.), *State v. Williams*, 6 Ohio St.3d 281, 290 (1983).

{¶87}   The record, without consideration of the statement of White's drug use, comprises overwhelming proof of White's guilt. Therefore, the admission of the statement, if erroneous, was harmless.

Case Nos. 2025-A-0019, 2025-A-0020

*Testimony involving a prior accidental shooting*

{¶88} White next contends that the trial court erred in permitting testimony regarding a prior incident between White and C.F. which resulted in the firearm discharging and an injury to C.F.'s foot.

{¶89} Defense counsel filed a motion in limine regarding the incident. Counsel sought to limit certain testimony regarding the prior incident, and the trial court overruled the motion. At trial, defense counsel objected to Lieutenant Palinkas's testimony wherein he described White's statements to him regarding the prior shooting involving the suspected murder weapon. White contends that this testimony constituted impermissible "other acts" evidence. We disagree.

{¶90} On its face, the testimony regarding a prior shooting incident that occurred six months prior to the murder, is a prior "other act", which may be excluded under Evid.R. 404(B). As noted above, the court must first consider whether the "other acts" evidence is "relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401." *Williams,* 2012-Ohio-5695, at ¶ 20.

{¶91} The State indicated that White admitted to the prior incident between her and C.F. at the Harbor Avenue residence which involved the suspected murder weapon. The State responded that such evidence illustrated that both White and C.F. had access to the suspected firearm and that the firearm was operational. Thus, the testimony was relevant by placing the suspected firearm at the Harbor Avenue residence.

{¶92} The second step in the *Williams* analysis is "to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in

Case Nos. 2025-A-0019, 2025-A-0020

order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)." *Williams* at ¶ 20. As noted above, it appears the State offered the evidence for a non-propensity purpose, identity and/or opportunity.

{¶93} As noted above, the inquiry does not stop after a non-propensity purpose is identified. The trial court must consider the evidence under Evid.R. 403(A) and determine if the probative value of that evidence "is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." The testimony regarding the shooting was limited. Upon review of the record, we do not conclude that the evidence was unduly prejudicial. The evidence was relevant to facts in dispute, to wit: the identity of the shooter and the operability of the firearm. As such, the trial court did not abuse its discretion in permitting this testimony.

*The admission of the picture of the noose*

{¶94} White next asserts that the trial court erred in admitting pictures from the crime scene which included a rope fashioned into a noose. Specifically, White asserts that the noose has no bearing on the murder and goes to the accused's suicidal ideations. White does not argue with any specificity how such evidence amounts to improper propensity evidence. The rope was collected at the residence after law enforcement officers and investigators observed what appeared to be blood on the rope and collected it as evidence.

{¶95} During direct examination, the State inquired about the scene and the observations and discoveries of law enforcement as they searched the Harbor Avenue residence. The State showed photographs of a rope that was tied into a noose and

appeared to have suspected blood stain evidence on it. Notably, the State did not elicit any testimony that White was planning to kill herself. Instead, that information was elicited by defense counsel on cross-examination where the following exchange occurred:

> Q. Okay. Let's talk for a minute about this noose, this piece of rope. When you asked Laura about that rope, she said that she was suicidal and wanted to hang herself; isn't that correct?
>
> A. I believe she did.
>
> Q. Okay. I'm showing you what I have marked as Defendant's Exhibit G. And what is that?
>
> A. That's the photo of the, ah -- I have it upside down.
>
> Q. I'm sorry about that.
>
> A. It's all right. It's a photo of the rope fashioned into a noose that was located at the top of the second floor stairs.
>
> Q. Okay. Go ahead and look at the rest of the pictures. There's four pictures there; is that correct?
>
> A. Appears to be.
>
> Q. Okay. And I'm referring to those four pictures collectively as Exhibit G.
>
> A. Okay.
>
> Q. Are all four of those that rope that you're calling a noose?
>
> A. They appear to be.
>
> Q. Okay. Can you describe, please, how that noose is up there, where it is?
>
> A. I don't recall specifically. I think it was just sitting on top of it. I don't think it was affixed or tied.

Q. Okay. Okay. So, it's -- we're not talking about something that's hanging from the ceiling. It's not in some gallows, it's not hanging from the ceiling or anything like that, right?

A. No.

Q. In fact, isn't it on top of a window in, like, a lace tablecloth or something lacy?

A. Something to the effect.

Q. Okay. And it's just sitting there on top of a window?

A. Correct.

Q. Just sitting there. Okay. Thank you.

{¶96} As the State did not elicit any testimony that White had planned to use the rope to harm herself, it is unclear how the evidence amounts to "other acts" evidence. Such testimony was elicited on cross examination by defense counsel, therefore any error in the admissibility of such testimony was invited. "It is well established that a party cannot complain on appeal that the trial court erred [by] permitting the admission of prejudicial testimony that the party elicited from a witness." *State v. Jackson*, 2023-Ohio-2193, ¶ 72 (3rd Dist.), *quoting State v. Rodgers*, 2023-Ohio-734, ¶ 77 (2d Dist.). "Under the doctrine of invited error, '[a] party will not be permitted to take advantage of an error [that] he himself invited or induced.'" *Jackson* at ¶ 72, *quoting State v. Breneman*, 2020-Ohio-4151, ¶ 48 (2d Dist.).

{¶97} Additionally, later in the trial, when the State recalled Lieutenant Palinkas to testify as to the contents of the journal, defense counsel asked the Lieutenant to read an additional section of a journal entry. Lieutenant Palinkas read the following: "My stomach

hurts when [C.F.] does his bullshit. God stop me from hanging myself off the bridge. He hit me in my stomach so hard."

{¶98} Here, any error was invited. Defense counsel elicited the testimony about White's consideration of suicide on cross examination. Thus, White cannot take advantage of the invited error on appeal.

*Lieutenant Palinkas's Testimony regarding White's statement about her sexual relationship with C.F.*

{¶99} Additionally, White asserts that the trial court erred when it permitted Lieutenant Palinkas to testify about White's statement that she had a sexual relationship with C.F., her cousin. Specifically, White alleges on appeal that such statement amounted to impermissible "other acts" evidence and subjected her to scorn and public outrage. On direct examination, Lieutenant Palinkas stated:

> Ah, she mentioned her relationship with him, um, and she touched on it briefly when we were at the house. Um, she had admitted that they had had an inappropriate sexual relationship, although that they were relatives, and we went into a little more detail on it in this interview. Ah, she said that the sexual relationship had lasted for about six to seven months before it had abruptly ended, um, and she had indicated it ended more because of him, because of the embarrassment factor of their relationship.

{¶100} Defense counsel did not object to the testimony, as such, White has waived all but plain error on appeal. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B).

{¶101} On its face, the testimony regarding the sexual relationship between White and C.F. is a prior other act, which may be excluded under Evid.R. 404(B). As noted above, the court must first consider whether the "other acts" evidence is "relevant to making any fact that is of consequence to the determination of the action more or less

probable than it would be without the evidence. Evid.R. 401." *Williams,* 2012-Ohio-5695, at ¶ 20. It was the State's position that White was jealous and the sexual history between her and C.F. was motive for the murder.

{¶102} The second step in the *Williams* analysis is "to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)." *Williams* at ¶ 20. As noted above, it appears the State offered the evidence for a non-propensity purpose, motive.

{¶103} As noted above, the inquiry does not stop after a non-propensity purpose is identified. The trial court must consider the evidence under Evid.R. 403(A) and determine if the probative value of that evidence "is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Upon review of the record, we cannot determine that the evidence was overly prejudicial. The evidence was relevant to facts in dispute.

{¶104} As such, the trial court did not abuse its discretion or commit plain error in permitting the testimony regarding the sexual relationship between White and C.F.

*Lieutenant Palinkas's testimony about the journal*

{¶105} White makes two arguments about the admission of the journal. In her first assignment of error, White asserts that the trial court erred in permitting readings from the notebook as the statements amount to inadmissible "other acts" evidence. In her second assignment of error, White contends that the trial court erred when it admitted the journal without proper foundation. We address both arguments together.

{¶106} White asserts that the statements from the journal that were read consisted of prior bad acts that were too remote in time to be probative of the murder. Lieutenant Palinkas read several passages from the journal to the jury at trial. The journal referenced C.F. "multiple times" and appeared to be written at least a year prior to the murder.

{¶107} One entry stated "I have so much hate in my heart for [C.F] how can my heart be pure It can not be pure with the hate I hold for the thing [C.F.] is doing to me." In another entry, "[C.F.] came back to the house [and] I'm asking, why god? I'm damb [sic] if I do, damb[sic] if I don't I do not understand what I'm supposed to do. He is always making me feel like I'm nothing. He's always talking [and] having sex in front of me while he's in the house."

{¶108} In another entry dated April 27, 2022, stated "I believe in You, most high Jesus. I make decisions base[d] on how [C.F] has treated me. I do love him yet I also believe he would not give me as many look-overs as I have to he. All of this deceit an[d] sabotage towards me is hard to accept."

{¶109} In another entry, dated February 9, 2023, read "I am so tired [and] still trying to maintain. I truly want to kick some ass - yet I'm too old for this shit. If they keep trying me I will give them these hands. . .Please keep these fools away from me. I have had enough. If you do not think so, you will have them try me [and] I'm going to take names. It's all going to be epic. . ."

{¶110} In *State v. Gaines,* 2003-Ohio-6855, ¶ 17 (8th Dist.), the Eighth District Court of Appeals reviewed a similar argument where a murder defendant alleged that letters written to the victim prior to the murder were impermissible "other acts" evidence and were improperly admitted at trial. The *Gaines* Court noted that the State had offered

Gaines's letters to the victim establish motive for the murder. The letters contained professions of love to the victim and jealousy toward another man that the victim was romantically involved with. One of the letters contained this passage: "I will fight or die for mine, or do what ever [sic.] it takes to keep mine, what ever [sic.] it take [sic.]." *Gaines* at ¶ 5.

{¶111} The Eighth District Court of Appeals determined that the letters did not constitute "other acts" evidence. Specifically, the court stated:

> Gaines' "act" of writing a letter is nothing for purposes of the [Evid.R. 404]—it is the contents of the letters that are important. And the content of the letters show no conduct that could be considered within the rule. The letters portray Gaines as a jealous man, perhaps even desperate to hold onto his relationship with the victim. But nothing in those letters contains an overt act that would fall under Evid.R. 404(B). Jealousy is an emotion, not an act. Without some physical manifestation of that emotion, the thoughts expressed in the letter remain just that—thoughts.
>
> Instead, we find that the letters were admissible because they gave context to subsequent events. Evidence that concerns "the chronological unfolding of events that led to an indictment, or other circumstances surrounding the crime, is not evidence of 'other acts' * * *." *United States v. Ojomo* (C.A.7, 2003), 332 F.3d 485, 489, quoting *United States v. Ramirez* (C.A.7, 1995), 45 F.3d 1096, 1102.

*Gaines* at ¶ 17-18.

{¶112} Similarly, the act of writing in a journal is not an "other act" that triggers Evid.R. 404. Instead, it would be the contents of the entry that are important. Like in *Gaines*, the contents of the entries do not show, state, or indicate any behavior or conduct that falls within the rule. Instead, the entries detail the tumultuous relationship between White and C.F. prior to the murder. The entries detail frustration that C.F. did not "look

over" White as many times as she did to him, and irritation that C.F. was having sex with other women in the house.

{¶113} Like in *Gaines*, the journal entries in this case helped to complete the story of the crime. The entries certainly support the State's theory that White was upset with C.F. and that her jealousy was motive for the murder. Without the entries, the jury would be left with little to no context to explain why White shot C.F.

{¶114} The court must next consider whether the journal entries clear the threshold of admissibility under Evid.R. 403(A) and determine if the probative value of that evidence "is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Here, the evidence was relevant to facts in dispute. The entries read into the record did not confuse the issues or mislead the jury. Further, upon review of the record, we cannot determine that the evidence was overly prejudicial.

{¶115} While the entries were written in the years leading up to the murder and remote in time, the timing of the entries are not so remote to render the entries unfairly prejudicial. See *Gaines* at ¶ 23. The *Gaines* court noted "Gaines was a jealous man and nothing in evidence showed that his jealousy cooled between the time he wrote the letters and committed the murder." Similarly, there is no evidence in the record to suggest that the animosity between C.F. and White had ceased between the date of the entries and the murder and that the entries were probative. As such the entries do not constitute "other acts" evidence. Furthermore, the admission of the journal entries was not unfairly prejudicial. As such, trial court did not err when it permitted Lieutenant Palinkas to testify to the journal entries.

Case Nos. 2025-A-0019, 2025-A-0020

{¶116} White also asserts that the trial court erred when it admitted the journal without a proper foundation. Specifically, White argues that there was no evidence to support the belief that White wrote the journal. We disagree.

{¶117} "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). "'This low threshold standard does not require conclusive proof of authenticity, but only sufficient foundational evidence for the trier of fact to conclude that the document is what its proponent claims it to be.'" *State v. Miller*, 2015-Ohio-956, ¶ 21, quoting *State v. Easter*, 75 Ohio App.3d 22, 25 (4th Dist.1991); Giannelli, Ohio Evidence Manual (1990) 6, Section 901.01. Authenticity can be demonstrated through either direct or circumstantial evidence. *State v. Jaskiewicz,* 2013-Ohio-4552, ¶ 12 (11th Dist.). We address the authentication of evidence under an abuse of discretion standard. *State v. Lautanen*, 2023-Ohio-1945, ¶ 59 (11th Dist.).

{¶118} Evid.R. 901(B)(1) provides, in relevant part: "[b]y way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule: (4) *Distinctive Characteristics and the Like.* Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances."

{¶119} At trial, prior to admission of exhibits, defense counsel objected to the admission of the journal on the grounds that the State failed to lay an adequate foundation. Specifically, there was no testimony about the contents of the journal. At the time of the objection, the only testimony offered at trial was that the journal was discovered in a bedroom of the Harbor Avenue residence. The State moved to recall

Case Nos. 2025-A-0019, 2025-A-0020

Lieutenant Palinkas to testify about the contents of the journal and the trial court granted the motion.

{¶120} Upon recall, Lieutenant Palinkas testified that the journal was discovered in an upstairs bedroom in the Harbor Avenue residence. The journal was written in the first person, and on several occasions, the author identified themselves as White. Additionally, it contained other personal information such as the names of White's parents, birthdates, and other writings that suggested the journal was written by White. Additionally, at the time of the murder and the discovery of the journal, White and C.F. were the only two individuals living at the residence according to White's statements to police.

{¶121} The contents of the journal or distinctive characteristics were sufficient to support a finding that the journal in question is what its proponent claims, to wit, White's journal. As such, the trial court did not err or otherwise abuse its discretion when it admitted the journal.

{¶122} Accordingly, White's first and second assignments of error are without merit.

**Conclusion**

{¶123} For the reasons set forth above, the judgments of the Ashtabula County Court of Common Pleas are affirmed.


JOHN J. EKLUND, J.,

EUGENE A. LUCCI, J.,

concur.

Case Nos. 2025-A-0019, 2025-A-0020

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, appellant's assignments of error are without merit. It is the judgment and order of this court that the judgments of the Ashtabula County Court of Common Pleas are affirmed.

Costs to be taxed against appellant.

JUDGE ROBERT J. PATTON

JUDGE JOHN J. EKLUND,
concurs

JUDGE EUGENE A. LUCCI,
concurs

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

Case Nos. 2025-A-0019, 2025-A-0020